BILLINGS SUGAR CO. ET AL., APPELLANTS, *v.* FISH ET AL., RESPONDENTS.

(No. 2,739.)

(Submitted December 16, 1909. Decided January 7, 1910.)

[106 Pac. 565.]

*Drains—Establishment—Public Purpose—Constitution—Special Assessments—Notice—Powers of Commissioner.*

Drains—Establishment—Nature of Proceedings.
1. The proceedings under the drainage district law (Laws 1905, Chap. 106, p. 254), in so far as they relate to the method of acquiring rights of way for ditches, etc., are essentially those of eminent domain.

Same—Public Use—How Determined.

2. While it is for the courts to determine whether the taking of private property for the construction of drains under the drainage district law is for a public use, the declaration of the legislature in enacting the statute should be given due weight in such determination.

Same—Public Use—Constitution.

3. *Held,* that Chapter 106, Laws of 1905, providing for the construction and maintenance of drains "whenever the same shall be conducive to the improvement or reclamation of agricultural lands, public health, convenience or welfare," is not unconstitutional as permitting the taking of private property for other than a public use. (Const., Art. III, sec. 14.)

Same—Special Assessments—Notice—Hearing.

4. Chapter 106 of the Laws of 1905 (before amendment by Session Laws 1909, Chap. 144, p. 231), known as the drainage district law, was not invalid, in that persons specially assessed for benefits were not given an opportunity to be heard before the assessment was finally made. The Act provided that the drain commissioner should, in his order establishing the drain, describe the several tracts to be assessed for benefits, and give ten days' notice of the time and place of letting the contract, when an opportunity was given to those interested to appear and be heard.

Same—Special Assessments—Power of Legislature.

5. In the absence of constitutional limitations, the legislature has power to compel local improvements, which in its judgment will promote the health of the whole people, or advance the public good, and provide for local assessments to pay for such works.

Same—Special Assessments—"Taxes"—Constitution.

6. Though special assessments for local improvements in the shape of drains in order to relieve marshy lands of surplus moisture are laid under the taxing power, their imposition does not fall within the restraints prescribed by the Constitution (Art. XII, secs. 4 and 11), relative to how, upon whom and on what property "taxes" may be levied. These sections refer solely to revenues which go to defray general governmental expenditures, as distinguished from special outlays to provide for purely local improvements.

Same—Commissioner—Powers—Constitution.

7. *Held,* that Chapter 106, Laws of 1905, providing for the creation and maintenance of drainage districts, is not open to the constitutional objection (Art. V, sec. 36) that it confers upon the drain commissioner the power to levy taxes.

Same—Assessments—Powers of Commissioner.

8. Under section 6 of Article XVI of the Constitution, the legislature may, in addition to those county officers provided for in that instrument, make provision for others as public convenience may require. The drainage district law (Chapter 106, Laws of 1905) authorizes the commissioners of each county desiring to avail itself of the benefits of the Act to appoint a drain commissioner with certain powers, among which is his authority to fix assessments to be paid by those directly benefited by the construction of drains, the assessments to be collected through the agency of the regular county officers. *Held,* that the contention that the legislative assembly had no authority to confer upon the commissioner the powers specified in the Act has no merit, but that for convenience in carrying out the object of the statute the legislature could, in addition to availing itself of existing agencies, create new ones.

*Appeal from Thirteenth Judicial District Court, Yellowstone County; Sydney Fox, Judge.*

ACTION by the Billings Sugar Company and others against J. W. Fish, county treasurer, and others. From a judgment for defendants, and from an order denying a new trial, plaintiffs appeal. Affirmed.

For Appellants, *Mr. O. F. Goddard,* and *Messrs. Gunn & Rasch,* submitted a brief. Oral argument by *Mr. Carl Rasch.*

In addition to the authorities noted by the court in its opinion upon the question whether the Act in question is in conflict with, and violative of, the state Constitution, counsel for appellants cite the following: *In re Ryers,* 72 N. Y. 1, 28 Am. Rep. 88; *Fleming* v. *Hull,* 73 Iowa, 598, 35 N. W. 673; *Jenal* v. *Green Island Drain Co.,* 12 Neb. 163, 10 N. W. 547; *People* v. *Parks,* 58 Cal. 624.

Upon the contention that the Act is unconstitutional in that it confers upon the drain commissioner too large and comprehensive powers, the following cases are cited: *Parks* v. *Board,* 61 Fed. 437; *Updike* v. *Wright,* 81 Ill. 49; *Hessler* v. *Drainage Commissioners,* 53 Ill. 105; *Gage* v. *Graham,* 57 Ill. 144; *Harward* v. *St. Clair etc. Levee & Drainage Co.,* 51 Ill. 130; *Board etc. Leveeing Wabash River* v. *Houston,* 71 Ill. 318; *Hinze* v. *People,* 92 Ill. 406; *Bernards Township* v. *Allen,* 61 N. J. L. 228, 39 Atl. 716; *Taylor* v. *Smith,* 50 N. J. L. 101, 11 Atl. 321; *State ex rel. Howe* v. *Des Moines,* 103 Iowa, 76, 64 Am. St. Rep. 157, 72 N. W. 639, 39 L. R. A. 285; *People* v. *Parks,* 58 Cal. 624; *Reelfoot Lake Levee Dist.* v. *Dawson,* 97 Tenn. 151, 36 S. W. 1041, 34 L. R. A. 725; *State* v. *Stanford,* 24 Utah, 148, 66 Pac. 1061; *Vallelly* v. *Board of Park Commissioners,* 16 N. D. 25, 111 N. W. 615, 15 L. R. A., n. s., 61.

To the point that the Act is repugnant to section 36, Article V of the Constitution, in that under it the legislature was prohibited from conferring upon the drain commissioner the power to levy taxes, these cases are cited: *Mellen* v. *Pittsburg Co.,* 21

Pitts. L. J. 185; *Keeler* v. *Westgate,* 10 Pa. Dist. R. 240; *Com. ex rel. Dave* v. *Smith,* 9 Pa. Dist. R. 350; *Perkins* v. *Philadelphia,* 156 Pa. 554, 27 Atl. 356; *In re Senate Bill,* 12 Colo. 188, 21 Pac. 481; *State* v. *Edwards,* 38 Mont. 250, 99 Pac. 942.

For Respondents, there was a brief by *Mr. Albert J. Galen,* Attorney General, and *Mr. W. H. Poorman,* Assistant Attorney General.    Oral argument by *Mr. W. L. Murphy,* Assistant Attorney General.

MR. JUSTICE SMITH delivered the opinion of the court.

A brief statement will suffice to indicate the points of law involved in these appeals.    Plaintiffs brought their action against the county treasurer, county commissioners, and county drain commissioner of Yellowstone county, to recover certain moneys paid as taxes in the year 1907, under protest, and to restrain the collection of similar taxes in subsequent years. These taxes for 1907 were collected by virtue of Chapter 106, page 254, Session Laws of 1905, now found, as amended by the Laws of 1907, under Part III, Title 11, Revised Codes, known as the "Drainage District Law."    The Act was again amended in 1909, but neither amendment is involved in this case, the taxes, the collection of which is sought to be restrained, having been levied, by virtue of the Act of 1905, to be collected in three installments.    The cause was tried to the district court of Yellowstone county, aided by a jury.    Certain special findings were made by the jury, and a general verdict was returned in favor of the plaintiffs.    The court set aside the general verdict, but adopted the special findings, concluded as matter of law that the defendants were entitled to prevail, and entered judgment accordingly.    From that judgment, and an order denying a new trial, the plaintiffs have appealed.

Appellants preface their argument thus: "The several errors assigned, calling in question the validity of the action of the court below, may well be considered together as a whole.    They are each and all based upon the proposition that the Act of the

legislative assembly, under which the drain in question in this case was constructed, is inoperative and void, for the reason that the provisions thereof, when tested by the principles of the settled law, are incapable of being legally complied with and carried into operative effect, and for the further reason that the Act is in conflict with, and violative of, the Constitution of the state of Montana."

Section 11, Article XII, of the state Constitution, reads as follows: "Taxes shall be levied and collected by general laws and for public purposes only. They shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax." Section 14, Article III, of the Constitution, reads: "Private property shall not be taken or damaged for public use without just compensation having been first made to or paid into court for the owner." Section 27, Article III, reads: "No person shall be deprived of life, liberty or property without due process of law."

Section 1 of the so-called "Drainage District Law" reads as follows: "That drains may be located, established, constructed and maintained and drains and watercourses may be cleaned out, straightened, widened, deepened and extended, whenever the same shall be conducive to the improvement or reclamation of agricultural lands, public health, convenience or welfare."

In the case of *Summers* v. *Sullivan*, 39 Mont. 42, 101 Pac. 166, this court said: "The legislative authority generally to enact these drainage statutes is derived from the police power, the power of eminent domain, or the taxing power. The proceedings under our statute are essentially those of eminent domain; and if, in obtaining a right of way for a drain across the lands of these plaintiffs, their lands will be depreciated in value by reason of the impairment of their water rights, this is one of the elements to be considered in assessing damages to them. The proceeding, in principle, is not different from the proceeding to establish a public road." In the *Summers Case* the constitutionality of the statute was not questioned. As was therein indicated, the proceedings under the drainage dis-

trict law, in so far as they relate to the method of acquiring a right of way for the ditch, are essentially those of eminent domain.

The following authorities are called to our attention by counsel for the appellants, in support of their contention that the law is unconstitutional: "Independently of express authority given by the Constitution, a state legislature cannot authorize the taking of private property for a merely private use, even upon making compensation. The doctrine of eminent domain is that private property may be appropriated to public use upon compensation being made, but it cannot be taken for strictly private purposes without the consent of the owner, whether compensation is made or not. The assertion of a right on the part of the legislature to take the property of one citizen and transfer it to another, even for a full compensation, where the public interest is not promoted thereby, is claiming a despotic power, and one inconsistent with every just principle and fundamental maxim of a free government." (15 Cyc. 578.) "It is well settled that the legislature has no power to authorize the taking of private property for a private use, without the owner's consent." (*Wisconsin Water Co.* v. *Winans*, 85 Wis. 26, 39 Am. St. Rep. 813, 54 N. W. 1003, 20 L. R. A. 662.)

In the case of *In re Theresa Drainage District*, 90 Wis. 301, 63 N. W. 288, the court said: "It is settled law in this state that private property can be taken *in invitum* for a public use only. For a private use it cannot be taken. * * * It is also settled that to dig ditches or drains across the land of private owners, under an apparent legislative authority, is a taking of the lands. * * * The question presented for decision is whether the digging of the ditches and drains, and the construction of the levees and other works contemplated by the statute, is for a public use. The provision of the statute is, 'If it shall appear to the court that the proposed drain or drains, ditch or ditches, levee or levees, or other works, is or are necessary, or will be useful for the drainage of the lands proposed to be drained thereby, for *agricultural, sanitary or*

*mining purposes,'* the court shall appoint commissioners. * * * There is in the entire statute no expression or intimation that it was any part of the consideration upon which the improvement should be authorized that it should be either necessary or desirable to promote any public interest, convenience, or welfare. No doubt, such an improvement may be useful to some, or perhaps many, private owners of land, by way of increasing the usefulness and value of their lands. But that is merely a private advantage. It interests the public only indirectly and remotely, in the same way and sense in which the public interest is advanced by the thrift and prosperity of individual citizens. * * * Some home or homes might be made more cheerful or more healthful. But one man's property cannot be taken to make another man's home more cheerful or healthful. It is only when it will make the homes of the public more healthful that any man's property can be taken for 'sanitary purposes.' But it is urged that the term 'sanitary purposes' comprehends and imports the idea of the public health. If so, it might save this statute." The court then proceeds to determine that the words "sanitary purposes" do not indicate that the use intended was a public one, and the statute is declared entirely invalid.

In the *Matter of Tuthill,* 163 N. Y. 133, 79 Am. St. Rep. 574, 57 N. E. 303, 49 L. R. A. 781, the court said: "It is an ancient principle, which entered into our social compact, that the use for which private property may be taken must be a public one, whether the taking be by the exercise of the right of eminent domain, or by that of taxation. The sovereign power is incapable of conferring any right to interfere with private property except it be needed for public objects. To take land for any other than a public use, to take it from one citizen, and to transfer it to another, even for full compensation, would be to violate the contract by which the land was originally granted by the government. * * * The state Constitution, from the beginning, by authorizing the appropriation of private property for public use, impliedly declared that for any other use private property should not be taken from one and applied to the

private use of another.'' The court then decided that the policy of the state of New York had never sanctioned drainage proceedings such as were involved in the case under consideration, and held the law void. The learned judge who wrote the opinion further said: ''But, lacking public ends, I find nothing in the past political history of the state which would justify laws by which a citizen may be authorized to take the property of his neighbor, by the exercise of the right of eminent domain, for a purpose which is primarily for his private benefit; although, incidentally, of such possible benefit generally as any improvement of agricultural lands would result in.''

In the case of *Kinnie* v. *Bare*, 68 Mich. 625, 36 N. W. 672, the supreme court of Michigan said, relative to a drainage law: ''Such proceedings can be authorized by the legislature only under the police power of the state. Drain laws which take from the citizen his private property against his will can be upheld solely upon the ground that such drains are necessary for the public health. They proceed upon the basis that low, wet, and marshy lands generate malaria, causing sickness and danger to the health and life of the people; that when they are of such character as to injure the health of the community, they become and are public nuisances, which ought to be abated, and the legislature has the right under the police power, inherent in every government, to protect the people from plague and pestilence, and to preserve the public health. But drainage for the purpose of private advantage, such as improving the quality of the land, or rendering it more productive or fit for cultivation, cannot be justified under the police power. Neither public convenience nor public welfare, independent of considerations of the public health, will justify the legislature in the enactment of laws for the construction and maintenance of drains and the assessment of taxes therefor. It is evident that where the public health is not affected by the existence of low, swampy land, the only object to be accomplished by their drainage is the improvement of the land itself.''

In the case of *Gifford Drainage District* v. *Shroer*, 145 Ind. 572, 44 N. E. 636, the supreme court of Indiana said: ''It has

been uniformly held by this court that the reclamation of wet land, and the drainage of ponds and marshes, is of public utility, and is for the benefit of the public health and welfare. * * * So far as the drainage of wet lands will promote the health of the public, it is by virtue of the police power of the state that the authority is exercised to enact such laws. * * * It is settled law in this state that the legislature has no power under the Constitution to enact a law authorizing one person to improve his own or the lands of another by draining or otherwise, and compel the persons benefited to pay therefor, unless the public is also benefited thereby. * * * Unless a general law in this state for the drainage of wet lands makes proper provision for the determination in each proceeding of the question whether the particular ditch or system of drainage will be of public utility, or promote the public health, welfare, and convenience, it will be unconstitutional and void. * * * Drainage, to benefit the lands for agricultural purposes alone, would be for the purpose of private gain or advantage, and would merely subserve private interests, without reference to those of the public.''

We have quoted thus at length from the foregoing authorities for the reason that they lay down the rule relied upon by the appellants, and seem to illustrate the public policy of the states in which they were decided. Many cases may be found which lay down the general rule that the land of one person cannot be taken for the benefit of another, without his consent, even though adequate compensation be tendered. We apprehend that most of these cases relate to proceedings in eminent domain, and do not, perhaps, involve exactly the same principle as that found in cases relating to the power of the legislature to compel a land owner to pay, by taxation, for the special benefits accruing to him on account of a public improvement affecting a community. Many courts, too, have declared without reservation, as did the Indiana court in the case last cited, that drainage of lands for agricultural purposes alone would be for the purpose of private gain. If by this is meant that such would necessarily be the only purpose subserved, we cannot agree with

the statement. The words "public utility" are used throughout the opinion, and perhaps that expression is intended to qualify the language we have quoted. At any rate, we are of opinion that the matter of public utility should be given great consideration in determining whether a statute providing for a system of drainage for agricultural purposes is constitutional. As was said in the *Matter of Tuthill, supra,* by the court of appeals of New York, the public policy of the state, as evidenced by former legislative enactments and decisions of the courts, may be looked to in order to determine what has theretofore been regarded as of public utility.

The supreme court of the United States, in *Fallbrook Irr. Dist.* v. *Bradley,* 164 U. S. 112-159, 17 Sup. Ct. 56, 63, 41 L. Ed. 369, said: "It is obvious, however, that what is a public use frequently and largely depends upon the facts and circumstances surrounding the particular subject matter in regard to which the character of the use is questioned." The supreme court of New Hampshire, in *Great Falls Mfg. Co.* v. *Fernald,* 47 N. H. 444-459, said: "It very clearly appears that, in the legislation and practice of the province and state, it had long been recognized, and was when the Constitution was adopted, as within the general scope of the legislative power to authorize private property to be taken for the purpose of erecting and improving water power in the streams and waters of the state, when, in the opinion of the legislature, the public good required it." Judge Cooley, in his work on Constitutional Limitations (seventh edition), page 768, says: "The reason of the case and the settled practice of free governments must be our guides in determining what is or is not to be regarded as a public use, and that can only be considered such where the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience, or welfare which, on account of their peculiar character, and the difficulty—perhaps impossibility—of making provision for them otherwise, is alike proper, useful, and needful for the government to provide."

It is for the courts to determine and decide whether the use is a public use. (*O'Reiley* v. *Kankakee Valley Draining Co.*, 32 Ind. 169-185; *Logan* v. *Stogsdale*, 123 Ind. 372, 24 N. E. 135, 8 L. R. A. 58.) In the case of *Dayton Mining Co.* v. *Seawell*, 11 Nev. 394, the court held that the declaration by the legislature that the purposes named in the Act under consideration were "to be for the public use and the right of eminent domain may be exercised therefor" was not conclusive upon the courts. Chief Justice Hawley, in writing the opinion, said, however: "But in this connection it must, as we think, be admitted that although the action of the legislature is not final, its decision upon this point is to be treated by the courts with the consideration which is due to a co-ordinate department of the state government." In that case a petition had been filed by the relator, a mining company, against the respondent as a district judge, praying for the appointment of commissioners to determine the compensation to be paid to one Waddell for a strip of land which the mining company desired to acquire for use in connection with its operations, by virtue of an Act "to encourage the mining, milling, smelting and other reduction of ores in the state of Nevada." The respondent claimed that the Act was in violation of that provision of the state Constitution which declared that no person should be "deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use without just compensation having been first made or secured." The court also said: "That the purposes mentioned in the Act are of vital necessity to the people of this state cannot be denied; that mining is the paramount interest of the state is not questioned; that anything that tends directly to encourage mineral developments and increase the mineral resources of the state is for the benefit of the public, and is calculated to advance the general welfare and prosperity of the people of this state, is a self-evident proposition." The Act was held to be valid.

The supreme court of the United States, in *Fallbrook Irr. Dist.* v. *Bradley, supra,* said: "To provide for the irrigation of lands in states where there is no color of necessity therefor

within any fair meaning of the term  *  *  * might be re-
garded by courts as an improper exercise of legislative will,
and the use might not be held to be public in any constitutional
sense, no matter how many owners were interested in the
scheme.  On the other hand, in a state like California, which
confessedly embraces millions of acres of arid lands, an Act of
the legislature providing for their irrigation might well be re-
garded as an act devoting the water to a public use, and there-
fore as a valid exercise of the legislative power.  The people
of California and the members of her legislature must in the
nature of things be more familiar with the facts and circum-
stances which surround the subject, and with the necessities
and the occasion for the irrigation of the lands, than can any-
one be who is a stranger to her soil.  This knowledge and famil-
iarity must have their due weight with the state courts which
are to pass upon the question of public use in the light of the
facts which surround the subject in their own state.  *  *  *
The use for which private property is to be taken must be a
public use, whether the taking be by the exercise of the right
of eminent domain or by that of taxation.  *  *  * While the
consideration that the work of irrigation must be abandoned
if the use of the water may not be held to be or constitute a
public use is not to be regarded as conclusive in favor of such
use, yet that fact is in this case a most important consideration.
Millions of acres of land otherwise cultivable must be left in
their present arid and worthless condition, and an effectual
obstacle will therefore remain in the way of the advance of a
large portion of the state in material wealth and prosperity.
To irrigate, and thus to bring into possible cultivation these
large masses of otherwise worthless lands, would seem to be a
public purpose, and a matter of public interest not confined to
the land owners, or even to any one section of the state.  The
fact that the use of the water is limited to the land owner is
not, therefore, a fatal objection to this legislation.  It is not
essential that the entire community, or even any considerable
portion thereof, should directly enjoy or participate in an im-
provement in order to constitute it a public use.  *  *  * The

case does not essentially differ from that of *Hagar* v. *Reclamation Dist.*, 111 U. S. 701, 4 Sup. Ct. 663, 28 L. Ed. 569, where this court held that the power of the legislature of California to prescribe a system of reclaiming swamp lands was not inconsistent with any provision of the federal Constitution. The power does not rest simply upon the ground that the reclamation must be necessary for the public health. That, indeed, is one ground for the interposition of the state, but not the only one. Statutes authorizing drainage of swamp lands have frequently been upheld independently of any effect upon the public health, as reasonable regulations for the general advantage of those who are treated for this purpose as owners of common property. (Citing *Head* v. *Amoskeag Mfg. Co.*, 113 U. S. 9-22, 5 Sup. Ct. 441, 28 L. Ed. 889; *Wurts* v. *Hoagland*, 114 U. S. 606, 611, 5 Sup. Ct. 1086, 29 L. Ed. 229; Cooley on Taxation, 2d ed., 617.) If it be essential or material for the prosperity of the community, and if the improvement be one in which all the land owners have to a certain extent a common interest, and the improvement cannot be accomplished without the concurrence of all, or nearly all, of such owners by reason of the peculiar natural condition of the tract sought to be reclaimed, then such reclamation may be made, and the land rendered useful to all, and at their joint expense. In such case the absolute right of each individual owner of land must yield to a certain extent, or be modified by corresponding rights on the part of other owners for what is declared upon the whole to be for the public benefit. Irrigation is not so different from the reclamation of swamps as to require the application of other and different principles to the case."

In the case of *Head* v. *Amoskeag Mfg. Co.*, above cited, the court said: "The statutes which have long existed in many states, authorizing the majority of the owners in severalty of adjacent meadow or swamp lands to have commissioners appointed to drain and improve the whole tract, by cutting ditches or otherwise, and to assess and levy the amount of the expense upon all the proprietors in proportion to the benefits received, have often been upheld, independently of any effect upon the

public health, as reasonable regulations for the general advantage of those who are treated for this purpose as owners of a common property."

In *Board of Directors* v. *Tregea*, 88 Cal. 334-354, 26 Pac. 237, 242, it was said: "The formation of irrigation districts is accomplished by proceedings so closely analogous to those prescribed for the formation of swamp land reclamation districts that the decisions with respect to the latter are authority as to the former."

In the case of *Hagar* v. *Supervisors*, 47 Cal. 222, the supreme court, in 1874, said: "It is said, however, that it is not within the constitutional power of the legislature to compel the petitioner to reclaim his lands at his own expense, and against his consent. But we think the power of the legislature to compel local improvements, which, in its judgment, will promote the health of the people and advance the public good, is unquestionable. In the exercise of this power it may abate nuisances, construct and repair highways, open canals for irrigating arid districts, and perform many other similar acts for the public good, and all at the expense of those who are to be chiefly and more immediately benefited by the improvement. * * * But we need not rest our decision on the narrow ground that this is strictly a local improvement. On the contrary, the reclamation of the vast bodies of swamp and overflowed land in this state may justly be regarded as a public improvement of great magnitude, and of the utmost importance to the community."

Again, the supreme court of California, in *Turlock Irr. Dist.* v. *Williams* (1888), 76 Cal. 360, 18 Pac. 379, said: "The results to be derived from a drainage law, and one which has for its purpose the irrigation of immense bodies of arid lands, must necessarily be the same, as respects the public good. * * * Such a general scheme, by which immigration may be stimulated, the taxable property of the state increased, the relative burdens of taxation upon the whole people decreased, and the comfort and advantage of many thriving communities subserved, would seem to redound to the common advantage of all

the people of the state, to a greater or less extent." (See, also, *Rutherford* v. *Mynes*, 97 Pa. 78.)

Perhaps the most instructive case to be found in the books is *In re Madera Irr. Dist.* (1891), 92 Cal. 296, 27 Am. St. Rep. 106, 28 Pac. 272, 14 L. R. A. 755, wherein Mr. Justice Harrison said, among other things: "In determining whether any particular measure is for the public advantage, it is not necessary to show that the entire body of the state is directly affected thereby, but it is sufficient that that portion of the state within the district provided for by the Act shall be benefited thereby. * * * Those portions of the state which are subject to overflow, and those which require drainage, as well as those which for the purpose of development require irrigation, fall equally within the purview of the legislature and its authority to legislate for the benefit of the entire state or for the individual district. * * * Whether the reclamation of the land be from excessive moisture to a condition suitable for cultivation, or from excessive aridity to the same condition, the right of the legislature to authorize such reclamation must be upheld upon the same principle, viz., the welfare of the public, and particularly that portion of the public within the district affected by the means adopted for such reclamation. Whatever tends to an increased prosperity of one portion of the state, or to promote its material development, is for the advantage of the entire state; and the right of the legislature to make provision for developing the productive capacity of the state, or for increasing facilities for the cultivation of its soil according to the requirements of the different portions thereof, is upheld by its power to act for the benefit of the people in affording them the right of 'acquiring, possessing and protecting the property' which is guaranteed to them by the Constitution. The local improvement contemplated by such legislation is for the benefit and general welfare of all persons interested in the lands within the district, and is a local public improvement. This principle is not contravened by the fact that it may even operate injuriously upon some of the individuals or proprietors of land within the district, or by the fact that there may be some who for personal

motives may wish to resist the improvement.'' (See, also, *Sisson* v. *Supervisors,* 128 Iowa, 442, 104 N. W. 454, 70 L. R. A. 440.)

Regarding this case as involving an important principle of constitutional law, and one of peculiar interest to all of the comparatively new states of the Union, we have quoted at length from the decisions of the courts of other states, in order to illustrate the principle seemingly running through all of the cases: that the constitutional questions involved should be decided in the light of conditions existing in the particular state. The public policy of the different states has been dictated by, and formulated upon, such considerations. Montana has been a state for a little over twenty years, and her public policy has, on many questions, not yet been indicated. It is so in the matter of the reclamation of wet or swampy lands. It will not do to say that the enactment of the law under consideration of itself indicates the policy of the state. In New York similar laws were declared unconstitutional when enacted, and, if we correctly interpret, the policy of the state was thought to be indicated by the decisions of the courts, rather than by the Acts of the legislature. In other words, the courts exercised the authority to declare what was, and what was not, a public use. But, as was said by Judge Hawley in the Nevada case, cited above, considerable weight should be given to the declaration of the legislature on the subject. Our legislature has declared, by implication, that the reclamation of land, for agricultural purposes alone, may be for the benefit of the public. Coupled with this declaration is another, to the effect that reclamation for the benefit of the public health may be accomplished by the exercise of the police power. This latter has always been the law, as we understand the cases, and the appellants do not controvert the soundness of the principle involved. We are not advised as to the area of swamp lands in Montana. But we feel warranted in concluding, from the fact that the legislature passed the law under consideration, that there are substantial portions of the state which require reclamation by drainage. The members of that body, coming, as they do, from all parts of the state, should be more conversant with the necessities of the com-

monwealth than are the members of this court.  It is not to be supposed that the law was passed with a sole view of being applied to any particular locality.  The supreme courts of the United States and of California have declared that there can be, in principle, no difference between a drainage reclamation law and a law providing for the irrigation of arid lands.  That the greater portion of this state is within what is called the arid zone is a well-known fact.  We know, of course, that Montana contains no vast areas of swamp lands; and in this regard the physical situation is different from that upon which irrigation laws are designed to operate.  But if the state contains any considerable area of marshy lands, to which this law may be applied, we think the principles upon which the two kinds of reclamation laws must rest for their validity are the same.  The mere fact that our arid lands are greatly in excess of our marsh lands will not alter the situation so as to necessitate the application of different principles of law to the two cases.  We must presume that the legislature in its wisdom has correctly determined that the state contains marsh lands of sufficient area to warrant the conclusion that their reclamation by drainage will redound to the public welfare, irrespective of any consideration of the public health.  The tenth legislative assembly passed a law providing for the creation and organization of irrigation districts (Laws 1907, Chap. 70; Title X, Part III, Revised Codes), and the eleventh legislative assembly also passed an Act to provide for the creation, organization, government, and extension of irrigation districts, and to repeal, with certain reservations, the provisions of sections 2309 to 2402, both inclusive of Title X, Part III, of the Revised Codes (Laws 1909, Chap. 146, p. 254).  The constitutionality of these Acts has never been questioned in this court, and it would be improper to directly consider the matter at this time; but the passage of the laws indicates that the people of Montana realize the necessity for legislation having for its purpose the reclamation by irrigation of the vast arid areas of the state, and our judicial knowledge enables us to say that such legislative enactments are conducive to the general public welfare.  Bearing in mind, then, the fact

that, physical conditions being substantially the same, these irrigation laws rest for their validity upon the same principles as do laws for the drainage of marsh lands, we cannot declare the drainage district law invalid without also holding, indirectly, that the irrigation district laws are also unconstitutional.

Montana, for years past, has been known to the world as a great mining state, and our mining industries are still prosecuted on a gigantic scale; but we believe statistics show that ·our agricultural development in the past few years has been so great that the products thereof now exceed in value the wealth produced by our mines. While we have a gross area of almost 150,000 square miles, there are in the state great regions of mountainous country which, it would now appear, can never be cultivated. Our lands that are suitable for agricultural purposes are being settled very rapidly, and the legislative and ⋅executive departments of the government are constantly engaged in commendable and successful endeavor to attract immigration to the state. The time has come when public policy and the welfare of the whole people seem to demand that all available portions of the state should be made productive. In the ⋅early days it was necessary, on account of the very limited development of our agricultural resources, to bring into the territory and state nearly all of those products of the soil which were in constant daily demand by the people. We produced large quantities of gold, silver, copper, lead, and other valuable metals, and raised great herds of cattle and sheep. The products of our mines and ranges were shipped mostly out of the state, and in return we were buyers of almost everything, save ⋅cattle and sheep, raised upon a farm. This system necessitated the expenditure of vast sums in the aggregate for transportation, and the price of farm products was correspondingly high. This condition affected all of the people in the state. To-day great lumbering operations are being carried on; our mines are in operation; new fields of industry are constantly being exploited; our cities and towns are growing in population, and, in ⋅consequence, our home market is increasing in scope and de-

mand. It is plainly to the advantage of all the people that this market should be supplied from within our own borders, and, as we think, the legislature has very wisely inaugurated a system of laws by which, when the public welfare demands, every available acre of our soil may eventually be brought to a state of productiveness. We are therefore of opinion, with reference, of course, to the constitutional provisions we have been considering, that the so-called drainage district law is a valid and constitutional enactment, not only as regards that portion thereof providing that drains may be constructed for the benefit of the public health, but also in so far as it provides for a system of drainage having for its object the improvement and reclamation of agricultural lands for the public good. While it is true that the law may, possibly, work a hardship upon an individual occasionally, and may, perhaps, be invoked in an attempt to advance a project solely for private benefit, and not for the public welfare, these are considerations for the legislative branch of the government to deal with. The law itself, however, seems to provide adequate safeguards against its abuse.

The foregoing disposition of the main constitutional question raised by the appellants makes it unnecessary to consider the second division of their brief. Their third contention is, as we understand, that the law cannot be complied with, according to its terms, in such a way as to give persons specially assessed for benefits an opportunity to be heard before the assessment is finally made. The Act provides that the drain commissioner shall include, in his final order of determination establishing the drain, "a description of the several tracts or parcels of land to be assessed for benefits in the construction of such drain, which said tracts or parcels shall constitute the special assessment district"; he shall give ten days' notice of the time and place of letting contracts for the construction of the drain, which notice "shall contain a description of the several tracts or parcels of land constituting the special assessment district, * * * and shall also state that at the time and place of such letting or at such other time and place thereafter to which the county drain commissioner may adjourn the same, the assessments for

benefits and the lands comprised within the special assessment district shall be subject to review for at least one day.   *   *   * At such review the county drain commissioner shall hear the proofs and allegations of all parties in interest, and shall carefully reconsider and review the descriptions of land comprised within the special assessment district, the several descriptions assessed and his assessments of benefits and define and equalize the same as may seem just and equitable.'' It is then provided that at the time and place of letting contracts, and before receiving any bids, the commissioner shall determine whether ''the whole of the per cent of taxes to be spread for benefits'' shall be ''assessed and collected'' in one year or several years. Such determination shall be made then and there, and publicly announced ''for the information of the bidders''; and the commissioner shall also ''then and there announce for the information of bidders the per cent of tax to be assessed against any district at large, and whether in his opinion it shall be necessary to divide the amount thereof into installments.'' While the language employed by the legislature is not very clear (indeed, it has since been amended), we think it is susceptible of but one construction, and that is: The commissioner shall, before receiving bids, *describe* the several tracts of land which in his judgment should be assessed for benefits, and then ascertain the *amounts* of the several assessments after he has learned what the cost of the project is to be. When this latter determination is complete, an opportunity is to be given to those interested to appear and be heard. This hearing may be adjourned, and, at the same, a review may be had, not only of the descriptions of land theretofore included in the special assessment district, but also of the amounts of the assessments for benefits theretofore made. The information regarding the commissioner's determination that the special assessments and the per cent of tax to be assessed against the district at large are to be paid in one or several years is expressly stated to be for the benefit of the bidders; but, even so, both matters might properly be decided by the commissioner before any bids were received, without prejudice to the rights of other interested

parties. It is not necessary to know the exact amount of the cost of the drain in order to make such a decision.

The last contention of the appellants is that the Act is unconstitutional for the reason that it violates section 11, Article XII, *supra,* section 4, Article XII, and section 36, Article V, of the state Constitution. The latter two sections read as follows:

"Sec. 4 [Article XII]. The legislative assembly shall not levy taxes upon the inhabitants or property in any county, city, town or municipal corporation for county, town or municipal purposes, but it may by law vest in the corporate authorities thereof powers to assess and collect taxes for such purposes."

"Sec. 36 [Article V]. The legislative assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes, or to perform any municipal functions whatever."

Counsel's printed argument is that the legislature had no authority "to confer upon the drain commissioner such large and comprehensive powers." Many cases have been called to our attention which, it is maintained, uphold the contention that the law is invalid in this regard. While we have carefully examined all of them, we shall not attempt to analyze or distinguish, but shall express our views on this branch of the case in the light of authorities which seem to us to be founded in reason and to embody correct principles of law.

We suppose it will not be questioned that a system of drainage, instituted in the interest of the public at large, that improves and makes susceptible of cultivation a large area of ground, will be of direct and peculiar benefit to the individual owners of the ground. Judge Cooley, in his work on Taxation, third edition, volume 2, page 1153, says: "Special assessments are a peculiar species of taxation, standing apart from the general burdens imposed for state and municipal purposes, and governed by principles that do not apply universally. * * * Special assessments * * * are made upon the assumption

that a portion of the community is to be specially and peculiarly benefited in the enhancement of the value of property peculiarly situated as regards a contemplated expenditure of public funds; and, in addition to the general levy, they demand that special contributions, in consideration of the special benefit, shall be made by the persons receiving it.   *   *   *   (Page 1156.)   Assessments being a peculiar species of taxation, there must be special authority of law for imposing them.   *   *   *   (Page 1158.)   No decision has ever undertaken to enumerate the cases in which special assessments are admissible.   *   *   *   The following purposes have been held to justify special burdens in return for special benefits.   *   *   *   (Page 1168.)   The expense of constructing drains in order to relieve swamps, marshes, and other low lands of their stagnant water is usually provided for by special assessments.   *   *   *   The special benefits from the enhancement of values must accrue mainly to the owners of the lands drained, who ought, therefore, to bear the expense.   But the authority to levy assessments for draining lands, upon no other considerations than such as pertain to the improvement of the land as property, must, it would seem, be confined within limited bounds.   *   *   *   But where any considerable tract of land, owned by different persons, is in a condition precluding cultivation, by reason of excessive moisture which drains would relieve, it may well be said that the public have such an interest in the improvement, and the consequent advancement of the general interest of the locality, as will justify the levy of assessments upon the owners for drainage purposes.   Such a case would seem to stand upon the same solid ground with assessments for levee purposes, which have for their object to protect lands from falling into a like condition of uselessness.''

The foregoing excerpts from the text of Judge Cooley's work are amply supported by the authorities found in the footnotes, from some of which we have already quoted.   Many others may be found in the books.   We are of opinion that the authority of the legislature to provide for and compel local improvements, which in its judgment will promote the health of the whole

people and advance the public good, cannot be doubted. (*Hagar v. Supervisors, supra.*) Assuming, then, that this power exists, how may it be exercised? The authority to compel the improvement necessarily comprehends the authority to compel payment therefor. "That these assessments are an exercise of the taxing power has over and over again been affirmed, until the controversy must be regarded as closed." (2 Cooley on Taxation, 3d ed., p. 1181.) The same author, at page 1201 of his work, says: "It is safe to assume, as the result of the cases, that the constitutional provisions refer solely to state taxation, or, when they go further, to the general taxation for state, county, and municipal purposes; and, though assessments are laid under the taxing power, and are in a certain sense taxes, yet that they are a peculiar class of taxes, and not within the meaning of that term as it is usually employed in our Constitutions and statutes." In the case of *Holley* v. *County of Orange,* 106 Cal. 420, 39 Pac. 790, it was held that a proviso in a statute that no tax should be levied upon any district until the proposition had been submitted to the qualified electors, applied only to such taxes as were levied upon property upon the *ad valorem* principle, as prescribed by the Constitution, and had no application to assessments where the charge was upon the property benefited, and was fixed in proportion to the benefits received. In the case of *Raleigh* v. *Peace,* 110 N. C. 32, 14 S. E. 521, 17 L. R. A. 330, it was held that, while special assessments for local benefit are taxes in a general sense, in that the authority to levy them must be derived from the legislature, they are nevertheless not to be considered as taxes falling within the restraints imposed by the Constitution, although the principle of uniformity governs both. The supreme court of Tennessee, in *Reelfoot Lake Levee Dist.* v. *Dawson,* 97 Tenn. 151, 36 S. W. 1041, 34 L. R. A. 725, used this language: "It could serve no valuable purpose for us, at this time, to review, or even cite, the numerous adjudged cases on this vexed question. Our examination of them justifies full concurrence with Judge Cooley, in the statement that the great weight of authority, for one reason and another, favors the distinction insisted upon by the complain-

ants in this case; nevertheless, it must be confessed that the adjudications found to be in the minority are not without support in sound reasoning.'' The court, then, following a former Tennessee case, adhered to the minority view. The supreme court of Alabama in *Mayor etc.* v. *Klein,* 89 Ala. 461, 7 South. 386, 8 L. R. A. 369, said: ''By the very terms employed throughout the article [of the Constitution] the taxes or taxation, whether state, county, or municipal, are those which make up the general revenues of the one or the other political division, as the case may be; revenues which come from all the property in the territory, and go to defray general governmental expenditures, as distinguished from special outlays to provide for purely local exigencies. * * * The authorities almost universally take such an imposition, though confessedly laid under the taxing power, out of the category of taxes and taxation, as those terms are employed in organic limitations on legislative power to levy or authorize the levying of taxes, and in general statutes.'' (See, also, *Farrar* v. *City of St. Louis,* 80 Mo. 379.)

As our state Constitution is simply a limitation upon the powers of the legislature (see *Evers* v. *Hudson,* 36 Mont. 135, 92 Pac. 462), it necessarily follows that the general power to enact taxation laws, inherent in all government, remains in that body, in the absence of limitations found in the organic law. Where no such limitation is found, the legislative assembly has all power. We are of opinion, therefore, in the light of the great weight of authority and what seems to us to be the better reasoning on the subject, that assessments for local improvements are not prohibited by our Constitution. Recurring for a moment to the matter of the general welfare of the people, it seems to us that the ruling here expressed is for the best interests of the state at large, and conducive to the upbuilding of the agricultural, as well as the urban portions of the commonwealth. Any other rule of construction would result in retarding the development, not only of our agricultural resources, but of our cities and towns as well.

Again, it is contended that the legislative assembly had no authority to confer upon the county drain commissioner the

powers specified in the Act. It is argued that sections 4 and 11 of Article XII of the Constitution absolutely limit the exercise of the taxing power to corporate authorities, and that section 36 of Article V prohibits the legislature from conferring the power to levy taxes upon the drain commissioner. Cases are cited in the brief which it is claimed uphold counsel's position. But in our judgment this latter constitutional provision has no bearing upon the law under consideration. The supreme court of California in *Re Madera Irr. Dist., supra,* said: "The members of the two houses are the constitutional agents of the public will in every district or locality of the state, and they may therefore so arrange the powers to be given and executed therein as convenience, the efficiency of administration, and the public good may seem to require, by committing some functions to local jurisdictions already established, or by establishing local jurisdictions for that express purpose." In *People* v. *Salomon,* 51 Ill. 37, the supreme court of Illinois said: "The Constitution nowhere commits corporate objects or purposes irrevocably to authorities now existing, nor does it prohibit the committal of them to such corporate authority as may be called into life by the same law which creates the subject and commits it to their jurisdiction." We have no doubt of the correctness of the general rules of law thus laid down, and may rest our decision on this branch of the case upon principles analogous to those indicated, supplemented by our organic law and the provisions of the Act under consideration. Section 6, Article XVI, of the Constitution is as follows: "The legislative assembly may provide for the election or appointment of such other county, precinct and municipal officers as public convenience may require and their terms of office shall be as prescribed by law, not in any case to exceed two years, except as in this Constitution otherwise provided." Section 3 of the drainage district law provides that the board of county commissioners of each organized county in the state which may desire to avail itself of the benefits of the Act shall appoint one drain commissioner. This officer is thereafter referred to as the county drain commissioner, and his term of office is fixed at two years. The law then pro-

vides that the amounts of the assessments shall be collected through the agency of the regular county officers. We have, then, a case in which the legislature has availed itself of the ordinary machinery of the county government, supplemented by the appointment of one additional officer, for the purpose of carrying the law into effect. We find no constitutional objection to this. (See *In re Senate Bill, etc.*, 12 Colo. 188, 21 Pac. 481; *State ex rel. Quintin* v. *Edwards*, 38 Mont. 250, 99 Pac. 940.) In fact, it appears to us to be an expeditious and inexpensive method of carrying out the provisions of the law. (See 2 Cooley on Taxation, 3d ed., pp. 1237, 1238.)

Having decided that the legislature had the power to provide for a system of drainage for the purpose of reclaiming agricultural lands, when such drainage is conducive to the general public welfare, and that the special assessments therefor are not taxes, in the sense in which that word is used in the Constitution and general statutes, there must of necessity be some legal method of carrying forward the legislative will that such law should be put into useful operation. This law provides that upon filing the application for the drain with the commissioner, he shall first examine the route of the proposed drain, and determine whether in his opinion it is necessary and conducive to the improvement or reclamation of agricultural lands, public health, convenience, or welfare that the application should be granted. And "if within twenty days after the making of such first order of determination all the persons through whose lands the proposed drain is to pass, shall not have executed a release of the right of way, and all damages on account thereof, the county drain commissioner shall, as soon as practicable, make application to the district court * * * for the appointment of three disinterested commissioners * * * to determine the necessity therefor and for the taking of private property for the use and benefit of the public, for the purpose thereof, and the just compensation to be made therefor." These commissioners "shall be sworn * * * to well and truly determine the necessity for such drain and the taking of private property for the use and benefit of the public for the pur-

pose thereof and the just compensation to be paid therefor."
In case the special commissioners shall decide that the drain is
unnecessary, the proceedings must be dismissed. Every rea-
sonable safeguard appears to have been provided for the pro-
tection of the taxpayer against arbitrary action on the part of
the authorities.

No constitutional provision has been called to our attention
which, in our judgment, in any way limits the general power of
the legislative assembly to enact laws, and we therefore hold
that the court below was correct in declaring this law valid.

The judgment and order appealed from are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY
concur.