In Re MOSSMAIN IRRIGATION DISTRICT. MOSSMAIN IRRIGATION DISTRICT, Respondent, *v.* CANYON CREEK DITCH COMPANY et al., Appellants.

(No. 6,720.)

(Submitted April 9, 1931. Decided May 12, 1931.)

[300 Pac. 280.]

2

*Mr. George S. Smith,* for Appellant Canyon Creek Ditch Company, submitted a brief and argued the cause orally.

4

6

*Messrs. Wood & Cooke,* for Appellant Billings Bench Water Association, submitted a brief.

*Messrs. Johnston, Coleman & Jameson,* for Respondent, submitted a brief; *Mr. W. M. Johnston* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This is an appeal from an order and judgment confirming the final report of the commissioners of the Mossmain Drainage District in Yellowstone county and levying an assessment against the property of the Canyon Creek Ditch Company and Billings Bench Water Association.

*As to the Appeal of the Canyon Creek Ditch Company.*

The ditch company is the owner of an irrigation ditch which forms the westerly and northerly boundary of the drainage district for a distance of from one to two miles; the portion

of the ditch forming the western boundary of the district being the portion assessed for the purposes of the district. Its carrying capacity is between four and five thousand miner's inches. The canal of the water association runs through the district for about a mile, and its carrying capacity is about twelve thousand miner's inches. Both of these waterways for a long distance have gravel bottoms and there is seepage from each into the lands embraced in the district. Large areas of land in the drainage district which formerly were arid and needing irrigation are now too water-logged and swampy to grow useful crops. There is no doubt that seepage from the ditch and canal have contributed largely to the present condition of the lands; and that condition will always continue so long as irrigation continues, unless the land is drained. Hence a drainage system has been created to carry away the surplus water so the lands may resume production.

The Canyon Creek ditch is on higher ground than the lands of the district, and while its length within the district is near unto two miles, only about a mile contributes to the swampy condition of the lands, for the reason that an old drain, called the Nutting, intercepts some of the seepage, as does the Billings Bench canal, between which and the Canyon Creek ditch one-third of the lands of the district lie. Two-thirds of the lands in the district lie below the Billings Bench canal. It is calculated that the lands contribute 1,600 acre-feet, the canal 600 acre-feet and the Canyon Creek ditch 200 acre-feet of the water necessary to be drained.

Upon this basis the cost of construction of the drainage system would be divided thus: Land, $10,000; water association, $3,750; ditch company, $1,250; but as all doubts were resolved in favor of the water association and the ditch company, according to the engineer for the district, the assessment against the association was fixed at $1,500 and against the ditch company $750. Of this more hereafter. The assessment against the lands was determined by taking the total cost of construction, subtracting therefrom the assessment against the

water companies, and prorating the remainder among the lands of the district by acre.

The ditch company filed its remonstrance against the final report of the commissioners, wherein it objected to the inclusion of its ditch in the district and the assessment against it, for the reasons that it will not derive any special benefit from the proposed work; that its only property consists of a ditch, used for the transportation of water, which ditch is not susceptible to being benefited by the proposed work; that it has been discriminated against; but its main ground is that the statute under which the assessment was made contravenes and violates the Constitution of the state of Montana and the Fourteenth Amendment to the Constitution of the United States. The remonstrance of the water association differs from that of the ditch company in some particulars, but in the main the contentions of the two companies are the same.

1. The drainage of swampy and water-logged lands has followed closely upon the settlement of the land in many parts of the United States, and drainage districts, combining the efforts of many where individuals could not do the work singly, have existed for long periods. Until recently these districts have had to do with the reclamation of lands which were swampy or water-logged by nature, but in the arid regions of the western states the problem in the beginning was one of getting water upon the land, not of getting it off. It is written into our Constitution: "The use of all water now appropriated, or that may hereafter be appropriated for sale, rental, distribution, or other beneficial use, and the right of way over the lands of others, for all ditches, drains, flumes, canals, and aqueducts, necessarily used in connection therewith, as well as the sites for reservoirs necessary for collecting and storing the same, shall be held to be a public use." (Article III, sec. 15, Constitution.)

Irrigation began in Montana quickly following the discovery of placer gold in large quantities, and it has continued increasingly ever since. Our experience has been the common one. As Mr. Kinney observes: "In the history of irriga-

tion, the lands adjoining the streams were first taken up and upon these irrigation operations were first commenced. These lands lying close to the natural streams required but little artificial drainage. But as time has gone on, the lands higher up and farther back from the stream were taken up and also irrigated. After this, it was found that the first farms were becoming too wet, caused by the seepage from the irrigation above them. This process has been repeated, and, as still higher lands were irrigated, in many instances, the first farms upon the lower lands have become practically swamps. It therefore naturally follows that, in order to develop these sections of the country to their full capacity, and not to retard their progress where they have been once developed, the question of the drainage of the lands has become one of great economic importance. In fact, the two questions of irrigation and drainage must go hand in hand where this condition exists." (Kinney on Irrigation & Water Rights, 2d ed., sec. 38.)

Swampy and water-logged lands as a result of irrigation existed in many parts of the state before our first drainage statute was enacted. (Chapter 106, Laws of 1905.) It provided for the exercise of power in establishing drains "whenever the same shall be conducive to the improvement or reclamation of agricultural lands, public health, convenience or welfare." (Article I, sec. 1.) Assessments were made upon the principle of benefits derived. (Article IV, sec. 6.) No thought seems to have been given to the cause of the condition sought to be remedied.

The law came before this court in *Billings Sugar Co.* v. *Fish*, 40 Mont. 256, 20 Ann. Cas. 264, 26 L. R. A. (n. s.) 973, 106 Pac. 565, and was held constitutional in a very able opinion by Mr. Justice Smith. This law, as superseded in 1915 (Chapter 147, Laws of 1915), took cognizance of the cause of the mischief. Section 1 of Article IV thereof in part is very similar to the 1929 amendment to section 7307, Revised Codes of 1921, to which we shall call attention presently. As illustrative, it made liable for assessment "all owners of irrigation

ditches or canals from which water seeps, drains or wastes to, upon or through lands included within the district served by the drain. * * * All of the above classes of lands, railways, irrigation ditches, counties, cities, towns, townsites and subdivisions shall be liable to assessment for the construction of drains in such proportions as may seem just and equitable." The Act recognized the principle of assessments for benefits, and also the principle that one who causes an injury should pay the damage.

The Act of 1915 was superseded by Chapter 129, Laws of 1921, which became sections 7265–7364, Revised Codes of 1921. The new Act changed the 1915 law in many particulars, and repealed section 1 of Article IV, supra. This Act is now the law in this state except as it has been amended by Chapter 169 of the Laws of 1929. For a general outline of the present law, see In re Valley Center Drain Dist., 64 Mont. 545, 211 Pac. 218. For the purposes of this opinion it is sufficient to say that after the district court has appointed three commissioners who have made a preliminary report, which the court has confirmed, the commissioners constitute the corporate authority of the drainage district. After the entry of the order of confirmation of the preliminary report of record, the drainage district is declared to be organized.

Section 7303, Revised Codes of 1921, provides that after the confirmation of the preliminary report, or within such time as the court may direct, the commissioners shall proceed to have all necessary levels and surveys made and to lay out the proposed work, make a map thereof, and plans, profiles and other specifications, and report in writing to the court. Then provisions are made as to what the report shall contain. The contents of the fourth subdivision of the report is prescribed in section 43, which became section 7307, Revised Codes of 1921, the first part of which reads as follows: "Fourth. What lands within the district as by them reported will be benefited by the proposed work; and they shall assess against each tract, lot, and easement, by whomsoever held, the amount of benefits which they determine will be caused to the same

by the proposed work." Section 7307 was amended by Chapter 169 of the Laws of 1929 to read as follows:

"Section 7307. Report as to Assessments. Fourth: What lands, easements, irrigation ditches, cities, towns, counties, individuals and other corporations and persons should be assessed for the payment of any part of the cost of constructing the proposed drains, repairs thereto, maintenance thereof and the incidental expenses attached to the establishment of such drainage district. In apportioning such costs and expenses, the following principles shall be regarded and the following classes of property, persons, corporations and municipalities shall be assessed:

"All lands which are swampy, bogged or water-logged, and will be relieved and improved by virtue of the construction of the proposed drainage system;

"All lands which are becoming, or are liable to become swampy, bogged, or water-logged, and which the construction of the proposed drainage system will prevent from being thus affected;

"All lands from which surface or seepage waters will enter or can be conducted into the proposed drainage system;

"All lands upon which or through which, surface or seepage water will be prevented from flowing, or can be prevented from flowing, by virtue of the construction of the proposed drainage system;

"All lands which will sustain any direct benefit of any kind or character whatsoever;

"All railways, whether operated by steam, electricity or otherwise, whose right-of-way or roadbed will be benefited or can be benefited by reason of the construction of the proposed drainage system.

"All owners of irrigation ditches or canals included within said district or from which water seeps, drains or wastes to, upon or through lands included within the said district;

"The county or counties which the proposed drainage system traverses, or which will be benefited as to public health,

convenience, welfare or improvement of any public highway;

"All incorporated cities or towns, and lands included within townsites and subdivisions, in whole or in part, directly benefited by reason of the construction of the proposed drainage system;

"All of the above classes of lands, railways, irrigation ditches, counties, cities, towns, townsites and sub-divisions shall be liable to assessment for the construction of the proposed drainage system in such proportions as may seem just and equitable.

"The benefits to accrue from the construction of the proposed drainage system, to a railway, county, incorporated city or town, and lands included within a platted townsite or subdivision being of a different character than those to accrue to agricultural lands shall be considered in apportioning the assessment, and also, the damages and inconvenience caused by seepage and waste waters from irrigation ditches and from the higher lands, shall be considered in apportioning the assessment to them.

"The assessment against each tract, lot, easement, town, city, county, irrigation ditch, railroad, individual or corporation owner thereof which will be benefited · by the proposed work or which, in any manner, contributes to the swamped, seeped, bogged or water-logged condition of any land within said district, and the proportionate share of cost of construction of the proposed drainage system, which each of them should bear shall be shown in tabular form, the columns of which shall be headed as follows: Column 1. Owners of property assessed; 2. Description of property assessed; 3. Number of acres assessed; 4. Amount of benefits assessed; 5. Number of acres taken for right-of-way; 6. Value of property taken; 7. Damages; 8. Assessment for costs; which shall be known as the assessment roll. Where property, persons or corporations, public or private, contribute to the damaged condition of the lands to be reclaimed, it shall not be necessary to assess

in such assessment roll the benefits to be derived by or accruing to them."

This 1929 amendment is made up by intermingling the major portion of section 1 of Article IV of the 1915 Act and the latter part of section 7307, Revised Codes of 1921, with an addition here and there. It combines the principle of benefits and the principle of contribution for injury done.

Counsel for the ditch company argue that the Act is unconstitutional in that it deprives the ditch company of its property without due process of law. It is argued that it leaves the amount of assessments to the arbitrary discretion of the board of commissioners resulting in an attempted delegation of legislative power; and provides an unfair discrimination between different pieces of property, in that it taxes one piece of property for benefits, while it imposes a penalty upon another because of its use.

The basis of this argument is "that assessments cannot be levied against property for special improvements unless the property is benefited by the proposed work." In support of this position counsel cite many cases, notably *Myles Salt Co.* v. *Board of Commrs.,* 239 U. S. 478, 60 L. Ed. 392, 36 Sup. Ct. Rep. 204, and cases cited therein; *Branson* v. *Bush,* 251 U. S. 182, 64 L. Ed. 215, 40 Sup. Ct. Rep. 113; *Reclamation Dist. No. 537* v. *Burger,* 122 Cal. 442, 55 Pac. 156; *Reclamation Dist. No. 70* v. *Birks,* 159 Cal. 233, 113 Pac. 170; *Brookes* v. *City of Oakland,* 160 Cal. 423, 117 Pac. 433. *Cosman* v. *Chestnut Valley Irr. Dist.,* 74 Mont. 111, 40 A. L. R. 1344, 238 Pac. 879, is in harmony with the foregoing cases in principle, but under none of the cases cited did the question arise as to whether lands not benefited by drainage, but which contributed to the swamped condition of the land to be drained, could be assessed for any part of the cost of construction of the drainage system. It is not likely that any such question could arise except in the irrigated portions of the country. Nor in the cases cited did any question arise as to whether ditches contributing to the swampy condition could be assessed for any part of the construction and main-

tenance of the drainage works. So far as we are aware, the exact question which we have before us has been before the supreme courts of but two states—Idaho and Nevada. The cases are *In re Drainage Dist. No. 1,* 29 Idaho, 377, 161 Pac. 315, *Burt* v. *Farmers' Co-operative Co., Ltd.,* 30 Idaho, 752, 168 Pac. 1078, 1082, and *McLean* v. *Truckee-Carson Irr. Dist.,* 49 Nev. 278, 245 Pac. 285, which is in accord with the Idaho cases.

The same arguments were advanced in the Idaho cases as here. By reason of the similarity of natural conditions in large areas in Montana and Idaho, the Idaho decisions are applicable here and we shall quote liberally from them.

In the *Drainage District Case* in 29 Idaho, 377, 161 Pac. 315, 320, the court said: "The English common law as well as the early American rule was to the effect that any person who conveyed or accumulated water upon his land by artificial means did so at his peril, and if any water should escape by means of seepage, and damage result, liability therefor was conclusively presumed. During the years of the development of irrigation in the western country, the courts, with the desire, evidently, of lending every encouragement to the reclamation of arid lands, required proof of negligence in the construction of canals before permitting the recovery of damages from seepage. (*Fleming* v. *Lockwood,* 36 Mont. 384, 122 Am. St. Rep. 375, 13 Ann. Cas. 263, 14 L. R. A. (n. s.) 1628, 92 Pac. 962.)"

Again: "It is a well-recognized rule of law that an owner of property ought not to be permitted to use it to the injury of the property of another, but recognizing that there are some injuries which result in damages for which compensation cannot be recovered in an action in court, we are satisfied that the legislature has full authority under the Constitution to provide for assessments and make all property subject to such assessments that is physically responsible for damages that result from acts for which no legal responsibility under an action to recover damages attaches, and that the legislature has done so under and by virtue of the drain-

age laws enacted by it.'' In other words, at legislative command, the doctrine *damnum absque injuria* must yield to *sic utere tuo ut alienum non laedas.*

Continuing, the court said: ''Suppose that one-half of the land in this drainage district was made worthless by reason of percolation and seepage from said canals, and suppose, also, that said canals were properly constructed and operated, that there was no negligence in either construction or operation, and that by reason thereof the landowners could not recover damages from those companies: Would it not appear to be contrary to the public policy of the state to hold that those companies could not be required to pay their proportionate part of the cost of a drainage system to protect the landowners from the seepage and overflow waters of such canals? The canals being physically responsible for much of the injury done to such lands, ought these companies not, in justice and equity, be required to pay their proportionate part of the cost for constructing a drainage system to carry off the seepage and overflow waters from their systems? * * * And it certainly is not the public policy of the state to permit thousands, if not hundreds of thousands, of acres of lands that were once productive to be ruined and made worthless, and leave the owners thereof remediless. It is only equitable and just that all who cause or assist in causing damage to, or the ruination of, such lands, pay their proportionate part of the cost of a drainage system to protect the lower lands from being made worthless. It is well known that the cost of drainage systems will in all probability be less than to require the canal companies to cement their canals or to otherwise make them impervious.''

The foregoing was approved in the *Burt Case,* a very able opinion, in which it was said that no reason is apparent why the legislature may not restore the common-law rule in part, or for some purposes only, with respect to damage done by canals and ditches.

Quoting from the *Burt Case:* ''We have no doubt of the power of the legislature to provide that lands which by rea-

son of artificial irrigation contribute by seepage and saturation to the swampy condition of lower lands shall contribute their just proportion of the cost of the construction of drainage works for the reclamation of such lower lands. This court has held that an irrigation district may construct drainage works as a necessary complement of its irrigation system. (*Bissett* v. *Pioneer Irr. Dist.*, 21 Idaho, 98, 120 Pac. 461; *Pioneer Irr. Dist.* v. *Stone*, 23 Idaho, 344, 130 Pac. 382; *Nampa & Meridian Irr. Dist.* v. *Petrie*, 28 Idaho, 227, 153 Pac. 425. * * * )

"It is further suggested that the assessments provided for by the drainage district Act are assessments for local improvements, and that to levy assessments on any other basis than that of enhanced value of the tracts assessed is unconstitutional as being the taking of property without due process of law, or without compensation therefor, and many cases are cited in support of this contention. We cite as illustrative of the principle involved, *Myles Salt Co.* v. *Board of Commrs.*, 239 U. S. 478, 60 L. Ed. 392, 36 Sup. Ct. Rep. 204; *Shaw* v. *Board of Commrs.*, 138 La. 917, 70 South. 910.

"We do not consider that this legislation is contrary to the constitutional provisions urged. This is rather the exercise of that power whereby the legislature provides the method and manner by which one may so use his own property as not to injure that of another."

With this we agree. But it is said by counsel for appellants that section 9a of the Idaho statute (Laws Idaho 1915, Chap. 42, p. 124) with which the *Drainage District* and *Burt Cases* deal is different from our statute. It is especially notable that Chief Justice Budge, dissenting in the *Burt Case*, pointed out that he would agree with the majority opinion if it contained the provision found in our 1915 statute (from which the 1929 provision is taken) with respect to irrigation ditches and canals. The opinion in the *Burt Case* concludes: "The legislature having power to provide for the levy of the assessment, the legislation must be upheld, even though in providing for the execution of the power the legislature may

have confused the principles upon which the assessment was to be based, and may have provided in the same Act for the levy of assessments on the basis of benefits received and responsibility for injuries inflicted.''

In considering the constitutionality of an Act ordinarily it does not matter that legal principles conflict. The question is: Is the legislation forbidden by constitutional provisions, national or state? If it is not, then it is constitutional even if in some respects it may prove unworkable. Again we say, although it is perhaps unnecessary, that every statute enacted by the legislature is presumed to be the result of the exercise of its constitutional right to enact it, and every reasonable doubt will be resolved in favor of the constitutionality of the law. (*State ex rel. Diederichs* v. *State Highway Commission,* 89 Mont. 205, 296 Pac. 1033; *Weber* v. *City of Helena,* 89 Mont. 109, 297 Pac. 455.)

That the public welfare requires the organization of drainage districts is no longer open to question in this state. We must determine our own public policy in the light of our own conditions (*Billings Sugar Co.* v. *Fish,* supra), and the legislature in this instance has done so.

The arguments of the ditch company to the effect that it is deprived of its property without due process of law, and that in leaving the amount of the assessments to the discretion of the commissioners, an attempted delegation of legislative power resulted, are answered above, and by the opinion in *In re Valley Center Drain Dist.,* supra. (And see *Voight* v. *City of Detroit,* 184 U. S. 115, 46 L. Ed. 459, 22 Sup. Ct. Rep. 337, and *Goodrich* v. *City of Detroit,* 184 U. S. 432, 46 L. Ed. 627, 22 Sup. Ct. Rep. 397.)

The mathematical apportionment suggested by counsel for the ditch company, as it seems to us, would be more likely to be arbitrary and unjust than is the discretionary rule prescribed by the statute. The necessities of the case present numerous and varying factors, the extent of which cannot be calculated to a certainty. Discretion necessarily must be lodged somewhere. It has been lodged in the commissioners,

and unless it is shown that they have abused their discretion no reason appears for disturbing their decision, which has been confirmed by the district court after a hearing upon the merits.

2. The second ground of complaint against the order attacked is grounded upon an alleged "plain discrimination" against the ditch company. This is based, counsel say, upon the difficulty in determining what factors were used in arriving at the assessment.

It is true that the statute does not prescribe rules of procedure with particularity, but considering the subject legislated upon we doubt if hard-and-fast rules would serve the purpose to be attained to better advantage than does the general rule laid down: "All of the above classes of lands railways, irrigation ditches, counties, cities, towns, townsites and sub-divisions shall be liable to assessment for the construction of the proposed drainage system in such proportions as may seem just and equitable," *et sequitur,* in the 1929 amendment.

When we take into consideration the many phases which every case of this character inevitably will present, the conclusion is that, after all, it presents a problem for the sound discretion of sensible men. First it is contemplated that an engineer, skilled in such matters, be employed and shall work under the supervision of the commissioners, who are presumed to be familiar with the local conditions, and the report is to be made to the district court which shall hear testimony upon the subject. It would seem that these safeguards should be ample protection to all concerned. Every interested person is entitled to notice of the hearing in court and may present his views thereon in writing and by oral testimony. Each one may remonstrate as was done by the appellants in this case.

Those in authority have to deal with seepage, with surface and with percolating waters. The subject of percolating waters is especially troublesome, for even the most experienced can seldom trace the source of the seepage and the channels

of the percolating waters with accuracy. It is said that the evidence discloses that no mathematical calculation was involved in arriving at the amount of the assessments, and that the amount determined was more or less arbitrary; that no accurate measurements were taken as to the seepage; and that other contributing agencies were not included in the calculations. The answer is that this criticism is more fanciful than real. No accurate measurements were possible. An attempt to measure the water flowing in the ditch would not have been useful, for the testimony indicates that it would have been subject to error to the extent of five per cent.

The engineer for the district testified that from long experience and the examination of state and governmental records in ditches and canals, seepage therefrom is found to amount to from one to three per cent., or thereabouts, depending upon the material which composes the bottom of the ditch, and where the bottom is of gravel, the loss is from two to three per cent. In order to give the appellants the benefit of all doubts, the seepage charged against them is less than one per cent. Moreover, it appears to us that the amount of the assessment made against each of them is less than the facts seem to warrant. While there is some conflict in the testimony, the district court resolved it, and we have no evidence upon which we find ourselves justified in disturbing the findings. Indeed, we have no disposition to do so, believing that the ditch company has been treated fairly upon the facts.

The engineer calculated, and in this it appears that the commissioners and court concurred, that both the Billings Bench canal and the Canyon Creek ditch would be benefited to a considerable extent by the creation of the district. And considering only the damages caused by the ditches, the facts would justify an assessment practically double that which was determined upon; it was cut down a half, testified the engineer, in order that the company and association would have no cause of complaint.

It is said also that other contributing factors were disregarded. From the testimony there is sufficient evidence to

show that there were no tangible or ascertainable contributing factors. There is evidence to show that the other factors mentioned did not contribute, for the reason that their seepage was intercepted before reaching the district.

But it is said that while the Billings Bench canal contributes three times as much seepage water as does the Canyon Creek ditch, the latter is assessed at half instead of one-third as much as the former, and therefore the Canyon Creek ditch is discriminated against. But it is not certain, and is in fact quite possible, according to the testimony, that the Canyon Creek ditch does contribute more than the figures indicate, because the Nutting drain and the Billings Bench ditch may not completely intercept its seepage. While assessing the water association but twice the amount of the Canyon Creek Ditch Company at first sight does not appear logical, in view of the numerous factors to be considered, the topography of the country, and the situation of the various ditches, we are not prepared to say that the commissioners and the court have discriminated against the Canyon Creek ditch. At any rate, it seems certain that the Canyon Creek ditch is not assessed as high as the facts warrant, and upon the whole case it has no just complaint. The order appealed from is affirmed.

*Appeal of the Billings Bench Water Association.*

3. What has been said in disposition of the Canyon Creek Ditch Company's appeal is applicable generally to the appeal of the Billings Bench Water Association. No additional facts of importance to the determination of the case appear in the transcript filed by the association.

Counsel for the association say their contentions are identical with those of counsel for the ditch company. Hence, it follows that the order appealed from by the Billings Bench Water Association ought to be, and is, affirmed.

ASSOCIATE JUSTICES GALEN, FORD, ANGSTMAN and MATTHEWS concur.