[S. F. No. 22728. In Bank. Mar. 26, 1970.]

CITY OF CARMEL-BY-THE-SEA, Plaintiff and Appellant, v. BERTRAM N. YOUNG, as District Attorney, etc., Defendant and Respondent.

260

**COUNSEL**

William B. Burleigh, City Attorney, for Plaintiff and Appellant.

Grayson Price, City Attorney (Chico), Vern B. Thomas, City Attorney (Escondido), Richard J. Moore, County Counsel (Alameda), Thomas J. Fennone, Deputy County Counsel, Douglas J. Maloney, County Counsel (Marin), Keith C. Sorenson, District Attorney (San Mateo), Milton Goldinger, County Counsel (Solano), Rutan & Tucker, H. Rodger Howell, James E. Erickson and Bruce D. Wallace as Amici Curiae on behalf of Plaintiff and Appellant.

William H. Stoffers, County Counsel, and Henry I. Jorgensen, Deputy County Counsel, for Defendant and Respondent.

Thomas C. Lynch, Attorney General, Charles A. Barrett, Assistant Attorney General, George J. Roth, Deputy Attorney General, George H. Murphy, Legislative Counsel, Clinton J. deWitt, Carl M. Arnold, John A. Corzine and James Reichle, Deputy Legislative Counsel, as Amici Curiae.

**OPINION**

**BURKE, J.**—In this declaratory relief suit attacking the constitutional validity of a financial interests public disclosure statute enacted in 1969 and by its terms applying to a myriad of public officers and employees, the trial

court rendered judgment decreeing that the statute is constitutional. Plaintiff appeals.

The public's right to know of matters which might bring about a conflict of interest between the public employment and the private financial interests of those holding public office is a laudable and proper legislative concern and purpose. Statutory history in this state is replete with examples of enactments designed to disclose, avoid or eliminate such conflicts. According to our count, there can presently be found in the Constitution and statutes of California more than 85 separate provisions, more fully discussed hereinafter, concerning conflicts of interests of public officers and employees.[1] Additionally, it is a matter of common knowledge that many local ordinances and charter provisions likewise contain regulations on the subject. However, despite our duty and desire to uphold lawful legislative enactments whenever possible, we are convinced that the attempted regulation now before us undertakes an overbroad intrusion into the right of privacy and thereby invalidly restricts the right to seek or hold public office or employment. Accordingly, the statute must fall and the judgment of the trial court must be reversed.

Those provisions of the disclosure statute which are here involved, found in sections 3600 through 3704 and comprising part of a new division 4.5 to Title 1 of the Government Code,[2] are set out in an appendix hereto. The statute directs that "every public officer" (§ 3700) and "each candidate" (§ 3702) for state or local public office, as those terms are defined in the statute (§§ 3605, 3601, 3753), "shall file, as a public record, a statement describing the nature and extent of his investments" and those "owned by either spouse or by a minor child thereof," if "such investment is in excess of [$10,000] . . . in value at the time of the statement" (§ 3700), but excepting "a home or [real] property used primarily for personal or recreational purposes." (§ 3603.) Violation of the statute is declared to be a misdemeanor, and knowing violation a felony. (§ 3704.)

Plaintiff city alleges and defendant admits that the following officers and officials of plaintiff will resign rather than be subjected to what they contend is an unconstitutional invasion of their privacy by requiring them to file such a statement of assets disclosing their personal financial affairs and those of their spouses and children: Three of the five members of the city council, four of the seven members of the planning commission, two of the five members of the forestry commission, three of the five members of the library

---

[1]See heading "Adverse or Pecuniary Interest" in General Index of West's Annotated California Codes, and in West's Annotated Government Code Index; see also Kaufman & Widiss, *California Conflict of Interest Laws*, 36 So.Cal.L.Rev. 186.

[2]All section references are to the Government Code unless otherwise stated.

board of trustees, one department head, three cultural commissioners. Plaintiff also alleges that resignation of the described officers will have a crippling effect upon the affairs of municipal government, which could find itself unable to act due to the impossibility of convening a quorum of the various governmental bodies. The declaratory relief here sought by the city on the ground of unconstitutionality of the statute is a proper remedy. (*Abbott* v. *City of Los Angeles* (1960) 53 Cal.2d 674, 678, fn. 2 [3 Cal.Rptr. 158, 349 P.2d 974], and authorities cited.)

The record indicates that many other public agencies are also faced with impending resignations of numerous officers and employees who are unwilling to make public disclosure of the magnitude provided by the statute, of private financial affairs. Its effect on potential candidates and employees is surmised to be similarly discouraging. We are thus presented with a question of constitutional magnitude affecting numerous public officials at every level of government which under exigent circumstances is now brought to our attention by two public officials from the County of Monterey. Other public officials have indicated their concern by filing extensive amici curiae briefs.

█ The familiar rule is that a "governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." (*N.A.A.C.P.* v. *Alabama* (1964) 377 U.S. 288, 307 [12 L.Ed.2d 325, 338, 84 S.Ct. 1302, 1314]; *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 485 [14 L.Ed.2d 510, 515, 85 S.Ct. 1678, 1682].) "[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." (*Shelton* v. *Tucker* (1960) 364 U.S. 479, 488 [5 L.Ed.2d 231, 237, 81 S.Ct. 247].) "Precision of regulation is required so that the exercise of our most precious freedoms will not be unduly curtailed except to the extent necessitated by the legitimate governmental objective. [Citations.]" (*Vogel* v. *County of Los Angeles* (1967) 68 Cal.2d 18, 22 [64 Cal.Rptr. 409, 434 P.2d 961].)

This court has recognized that "The freedom of the individual to participate in political activity is a fundamental principle of a democratic society and is the premise upon which our form of government is based. Our state Constitution declares, 'All political power is inherent in the people' [citation], and the First Amendment of the federal Constitution establishes the right of every citizen to engage in political expression and association. [Citations.] In this state both statutes and judicial decisions have recognized the fundamental right of citizens generally not only to vote but also to hold office [citations], and the fundamental right of employees in general to engage in political activity without interference by employers [citations]." (*Fort* v. *Civil Service Com.* (1964) 61 Cal.2d 331, 334-335 [38 Cal.Rptr. 625, 392 P.2d 385].)

In the cited case Fort, who was director of a county alcoholism treatment center, acted as chairman of a speakers' bureau for a local campaign committee for a gubernatorial candidate. He was dismissed from his county position for violation of a charter provision that no civil service officer or employee "shall take any part in . . . any political campaign or election, . . . other than to cast his vote or to privately express his opinion." We held that the charter provision was overly broad, and ordered him reinstated.

Our opinion emphasized (pp. 337-338 of 61 Cal.2d) that "The United States Supreme Court and this court have . . . made it clear in recent decisions that, even if a compelling state purpose is present, the restriction must be drawn with narrow specificity. [Citations.] . . . The principles set forth in the recent decisions do not admit of wholesale restrictions on political activities merely because the persons affected are public employees, particularly when it is considered that there are millions of such persons. [Fn. omitted.] It must appear that restrictions imposed by a governmental entity are not broader than are required to preserve the efficiency and integrity of its public service."

*Kinnear* v. *City & County of San Francisco* (1964) 61 Cal.2d 341 [38 Cal.Rptr. 631, 392 P.2d 391], holds that the principles set forth in *Fort, supra,* 61 Cal.2d 331, required reinstatement of a civil service deputy sheriff who had filed a declaration of candidacy for the office of sheriff and had then been notified of automatic forfeiture of office under a San Francisco charter provision forfeiting the office of an appointive officer or employee who became a candidate for election to any public office. Our opinion declares (p. 343 of 61 Cal.2d) that although the charter provision "is not uncertain and is directed solely to the activity of seeking public office, it is no less subject to the criticism that it relates alike to all public offices, whether they be partisan or nonpartisan in character and whether they be San Francisco offices or national or state offices. San Francisco has not, as it must in order to prevail, shown a compelling need to restrict the fundamental right involved on such a sweeping scale."

*Fort* and *Kinnear* were followed by *Bagley* (*Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499 [55 Cal.Rptr. 401, 421 P.2d 409]), in which plaintiff nurse's aide employed by a hospital district having no civil service or merit system in force was dismissed after being notified that her off-duty participation in a recall campaign aimed at certain members of the district board of directors was unlawful and constituted grounds for dismissal under Government Code section 3205. That section provided in pertinent part that no employee of a local agency "shall take an active part in any campaign for or against any candidate, except himself, for any office of such local agency, or for or against any ballot measure relating to the recall of any elected official of the local agency." Declaring the restraints on plaintiff's

political activity unconstitutional, this court reaffirmed in the following language the principles declared in *Fort, supra:*

"[A] governmental agency which would require a waiver of constitutional rights as a condition of public employment must demonstrate: (1) that the political restraints rationally relate to the enhancement of the public service, (2) that the benefits which the public gains by the restraints outweigh the resulting impairment of constitutional rights, and (3) that no alternatives less subversive of constitutional rights are available. . . . Although an individual can claim no constitutional right to obtain public employment or to receive any other publicly conferred benefit, the government cannot condition admission to such employment or receipt of such benefits upon any terms that it may choose to impose. . . . Today courts and commentators alike recognize without question that the power of government, federal or state, to withhold benefits from its citizens does not encompass a supposed 'lesser' power to grant such benefits upon an arbitrary deprivation of constitutional right." (Pp. 501-504 of 65 Cal.2d.)

*Bagley* recognized that "government may, when circumstances inexorably so require, impose conditions upon the enjoyment of publicly conferred benefits despite a resulting qualification of constitutional rights" (p. 505), but emphasized that in doing so "government bears a heavy burden of demonstrating the practical necessity for the limitation. At the very least it must establish that the imposed conditions relate to . . . [and] reasonably tend to further . . '. the purposes of the legislation which confers the benefit or privilege. . . . [A]lso the utility of imposing the conditions must manifestly outweigh any resulting impairment of constitutional rights. Further . . . the state must establish the unavailability of less offensive alternatives and demonstrate that the conditions are drawn with narrow specificity, restricting the exercise of constitutional rights only to the extent necessary to maintain the integrity of the program which confers the benefits. [Fn. omitted.]

"The public employee surely enjoys the status of a person protected by constitutional right. Public employment does not deprive him of constitutional protection." (Pp. 505-507 of 65 Cal.2d.)

Applying the *Fort* declaration that it must appear that restrictions imposed by a governmental entity on political activities of public employees "are not broader than are required to preserve the efficiency and integrity of its public service," *Bagley* ruled (p. 508) that the restrictions imposed upon plaintiff's political activities by section 3205, relied upon by defendant district, were not required to preserve the efficiency and integrity of the public service or its successful functioning, that the restrictions were overbroad "in the wide swath of [the] prohibition of employee participation in a number and variety of elections" and could not be justified by applying them narrowly within the proposition that a public employee may consti-

tutionally be prevented from opposing the reelection of "his own superior." (P. 509.)

*Bagley* noted additionally that "the expansion of government enterprise with its ever-increasing number of employees marks this area of law a crucial one. As the number of persons employed by government . . . continues to grow, the necessity of preserving for them the maximum practicable right to participate in the political life of the republic grows with it. Restrictions on public employees which, in some or all of their applications, advance no compelling public interest commensurate with the waiver of constitutional rights which they require imperil the continued operation of our institutions of representative government." (Pp. 510-511.)

In *Vogel* v. *County of Los Angeles* (1967) *supra,* 68 Cal.2d 18, 21, we once more affirmed that "When the government seeks to require a limitation of constitutional rights as a condition of public employment, it bears the heavy burden of demonstrating the practical necessity for the limitation. The conditions . . . must reasonably tend to further the purposes of the government . . . and the utility of imposing the conditions must manifestly outweigh the impairment of constitutional rights. [Citations.]"

■ The concept of personal liberties and fundamental human rights entitled to protection against overbroad intrusion or regulation by government is not limited to those expressly mentioned in either the Bill of Rights or elsewhere in the Constitution, but instead extends to basic values "implicit in the concept of ordered liberty" (*Palko* v. *Connecticut* (1937) 302 U.S. 319, 325 [82 L.Ed. 288, 292, 58 S.Ct. 149]) and to "the basic civil rights of man." (*Skinner* v. *Oklahoma* (1942) 316 U.S. 535, 541 [86 L.Ed. 1655, 1660, 62 S.Ct. 1110, 1113].) Among such basic liberties and rights not explicitly listed in the Constitution are the right "to marry, establish a home and bring up children" (*Meyer* v. *Nebraska* (1923) 262 U.S. 390, 399 [67 L.Ed. 1042, 1045, 43 S.Ct. 625, 626, 29 A.L.R. 1446]); the right to educate one's children as one chooses (*Pierce* v. *Society of the Sisters* (1925) 268 U.S. 510, 534-535 [69 L.Ed. 1070, 1077-1078, 45 S.Ct. 571, 573, 39 A.L.R. 468]); the right to marry the person of one's choice (*Perez* v. *Sharp* (1948) 32 Cal.2d 711, 714 [198 P.2d 17]); the "right to travel" (*Aptheker* v. *Secretary of State* (1964) 378 U.S. 500 [12 L.Ed.2d 992, 84 S.Ct. 1659]; *Kent* v. *Dulles* (1958) 357 U.S. 116 [2 L.Ed.2d 1204, 78 S.Ct. 1113]; *Shapiro* v.*Thompson* (1969) 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322, 1329]); "freedom to associate and privacy in one's associations" including privacy of the membership lists of a constitutionally valid organization (*N.A.A.C.P.* v. *Alabama* (1958) 357 U.S. 449, 462 [2 L.Ed.2d 1488, 1499, 78 S.Ct. 1163, 1172]; see also *Bates* v. *Little Rock* (1960) 361 U.S. 516, 523-527 [4 L.Ed.2d 480, 485-488, 80 S.Ct. 412]; *Gibson* v. *Florida Legislative Investigation Committee* (1963) 372 U.S. 539, 557-558 [9 L.Ed.2d 929, 941-942, 83 S.Ct. 889]; *Huntley* v. *Public Utilities*

*Com.* (1968) 69 Cal.2d 67, 72-74 [69 Cal.Rptr. 605, 442 P.2d 685]); and the right to privacy and to be let alone by the government in "the private realm of family life." (*Prince* v. *Massachusetts* (1944) 321 U.S. 158, 166 [88 L.Ed. 645, 652, 64 S.Ct. 438, 442]; *Griswold* v. *Connecticut, supra,* 381 U.S. 479, concurring opinions at pp. 495, 502 [14 L.Ed. 510 at pp. 521, 525].) Forms of "association" have been protected that are not political in the customary sense but pertain to the social, legal, and economic benefit of the members. (*Griswold* v. *Connecticut, supra,* at p. 483 of 381 U.S. [at p. 514 of 14 L.Ed.2d].)

Certain of the protected rights and liberties not specifically mentioned in the Constitution have been viewed as falling within the penumbra or periphery of the Bill of Rights, and others as being fundamental and basic personal rights "retained by the people" within the meaning of the Ninth Amendment.[3] (*Griswold* v. *Connecticut, supra,* at pp. 484-485 of 381 U.S., and at pp. 487-499 [at pp. 514-515 of 14 L.Ed.2d, and at pp. 517-523] of first concurring opinion.)

Differing aspects of the protection of privacy from intrusion by government are variously found to lie in the penumbra of the First Amendment, in the restrictions of the due process clause of the Fourteenth Amendment, or in the Ninth Amendment retained rights; other zones of privacy are affirmed in the Fourth Amendment "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures," and in the self-incrimination clause of the Fifth Amendment. (*Griswold* v. *Connecticut, supra;* also p. 500 [14 L.Ed.2d p. 524] of second concurring opinion, pp. 502 and 507 [14 L.Ed.2d pp. 525 and 528] of third concurring opinion; see also *Camara* v. *Municipal Court* (1967) 387 U.S. 523, 539 [18 L.Ed.2d 930, 941, 87 S.Ct. 1727]; *People* v. *Edwards* (1969) 71 Cal.2d 1096, 1099-1105 [80 Cal.Rptr. 633, 458 P.2d 713]; *Parrish* v. *Civil Service Com.* (1967) 66 Cal.2d 260, 263, 271, 276 [57 Cal.Rptr. 623, 425 P.2d 223].) As *Griswold* notes, "The Fourth and Fifth Amendments were described in *Boyd* v. *United States,* 116 U.S. 616, 630 [29 L.Ed. 746, 751, 6 S.Ct. 524], as protection against all governmental invasions 'of the sanctity of a man's home and the privacies of life.' " (P. 484 of 381 U.S. [P. 515 of 14 L.Ed.2d].) The specific privacy right protected in *Griswold* was that "surrounding the marriage relationship" (p. 486 of 381 U.S. [p. 516 of 14 L.Ed. 2d].) held to have been violated by a statute forbidding the use of contraceptives. In *Camara* an ordinance authorizing a warrantless inspection of residential premises for possible violations of a city housing code was held to violate the Fourth Amendment "right to be

---

[3]The Ninth Amendment reads: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

free from unreasonable government invasions of privacy." (P. 539 of 387 U.S. [p. 941 of 18 L.Ed.2d].) In *Edwards* search without a warrant of defendants' trash cans located in "the open back yard area" of their residence was held to have violated the guarantee of personal privacy found in both federal (Fourth Amendment) and state (art. I, § 19) Constitutions. And in *Parrish* we ruled that the receipt of welfare benefits could not be conditioned upon a waiver by recipients of their Fourth Amendment "rights of privacy and repose," which would result from a requirement that welfare recipients consent to a search of their homes for the purpose of detecting the presence of "unauthorized males" whose incomes might then be considered in determining the amounts of welfare grants. (Pp. 263, 271, 276, of 66 Cal.2d.)

As plaintiff city points out, the right of privacy concerns one's feelings and one's own peace of mind (*Fairfield* v. *American Photocopy etc. Co.* (1955) 138 Cal.App.2d 82, 86 [291 P.2d 194]), and certainly one's personal financial affairs are an essential element of such peace of mind. Moreover, personal financial affairs are clearly more than the "adjunct to the domestic economy" referred to in *Edwards, supra,* (p. 1104 of 71 Cal.2d); instead they would appear to constitute the primary supporting pillar of that economy. ■ In any event we are satisfied that the protection of one's personal financial affairs and those of his (or her) spouse and children against compulsory public disclosure is an aspect of the zone of privacy which is protected by the Fourth Amendment and which also falls within that penumbra of constitutional rights into which the government may not intrude absent a showing of compelling need and that the intrusion is not overly broad. ■ "[W]here fundamental personal liberties are involved, they may not be abridged by the States simply on a showing that a regulatory statute has some rational relationship to the effectuation of a proper state purpose. 'Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling.' [Citation.] The law must be shown 'necessary, and not merely rationally related to, the accomplishment of a permissible state policy.' [Citations.]" (*Griswold* v. *Connecticut, supra,* 381 U.S. 479, 497 [14 L.Ed.2d 510, 522, 85 S.Ct. 1678, 1689].) "The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose." (*Shelton* v. *Tucker, supra,* 364 U.S. 479, 488 [5 L.Ed.2d 231 at p. 237].)

The governmental purpose of the statute here at issue is declared in section 3600. Briefly, it is to assure the people to the fullest extent possible that the private financial dealings of public officials and of candidates for

public office "present no conflict of interest between the public trust and private gain." Obviously the elimination and prevention of conflict of interest is a proper state purpose, but that alone does not justify "means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." (*Shelton* v. *Tucker, supra.*) Instead, in the present case there must be a balancing of interests between the government's need to expose or minimize possible conflicts of interest on the one hand and the right to maintain privacy in one's personal financial affairs while seeking or holding public office on the other—as in *Fort* and *Bagley, supra,* the need to preserve the efficiency and integrity of the public service was balanced against the freedom to participate in political activity while in the public employ.

■ The financial disclosure requirements of the statute now before us encompass indiscriminately persons holding office in a statewide agency regardless of the nature or scope of activity of the agency, as well as those whose offices are local in nature (i.e., with "a city, a county, a city and county, or a district, or any subdivision, department, board, commission, body or agency of the foregoing," § 3601, see also § 3605). No effort is made to relate the disclosure to financial dealings or assets which might be expected to give rise to a conflict of interest; that is, to those having some rational connection with or bearing upon, or which might be affected by, the functions or jurisdiction of any particular agency, whether statewide or local, or on the functions or jurisdiction of any particular public officer or employee. Instead, the statute directs that *every* public officer and *each* candidate shall file as a *public record,* "a statement describing the nature and extent of his investments" and those "owned by either spouse or by a minor child thereof," if "such investment is in excess of" $10,000, excepting only a home and real property used primarily for personal or recreational purposes. (§§ 3700, 3702, 3603, 3604.)

Thus, for example, an officer of a local zoning agency, library board, water district, etc., is told he must publicly disclose any investment valued at over $10,000 held by the officer, his (or her) spouse, or a minor child of either, without regard to the nature or locale of the asset or whether it bears the remotest relation to the duties of the public office or, indeed, if it belongs to the spouse or a minor child, whether the public officer controls it or whether the owner accedes to the public disclosure.[4] Similarly an officer of a statewide agency is told that public disclosure must be made of the investments of either spouse and of minor children regardless of any rela-

---

[4]It appears appropriate to note that many a spouse (whether husband or wife) of a public officer or employee has private employment or is engaged in personal business or in a professional occupation which would suffer from public disclosures of the extent required by the statute here at issue.

tion or lack thereof between the functions of the office and the nature or location of the asset.

Moreover, as plaintiff also points out, the newspaper publication of a public officer's assets, or those of the spouse or children, can be expected to bring unwanted solicitation from a variety of salesmen and others, could well encourage harassment lawsuits or demands of like nature, and could expose the public officer and family to various criminal elements in our society. Other public officials whose worth or investments do not require disclosure may find that fact understandably embarrassing. The invasion of privacy rights and the chilling or discouraging effect upon the seeking or holding of public office, great or small, or high or low, appears too clear for dispute.

It may be assumed that a requirement of relevant disclosures of investments or assets would bear a rational relationship to the valid state purpose of preventing conflicts of interest on the part of public officials and employees. However, we are convinced that the purpose can be achieved by regulations drawn more narrowly and precisely than is attempted by the statute now before us. Indeed, as stated, more than 85 specific and to-the-point laws are already on the books in California. (See fn. 1, *ante.*) Those various enactments can be roughly divided into two categories. The first group simply restricts public officials and employees from entering into transactions which may cause a conflict of interests. The second group requires an actual disclosure of any conflict of interest relevant to the official duties of the officer or employee.

The majority of the statutes dealing with conflicts of interest prohibit public officers and employees from entering into transactions which will conflict with the performance of their official duties. The most broadly drafted statute of this type appears to be Government Code section 1090: "Members of the Legislature, state, county, special district, judicial district, and city officers or employees shall not be financially interested in any contact made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, special district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity." (And see Gov. Code, § 8920.)

Most statutes of this type, however, are more narrowly drawn, regulating specific public officers and specific areas of potential conflict. Two statutes will illustrate:

Agricultural Code, section 12783 (regulation of economic poisons): "Any person that is charged with the enforcement or execution of any of the provisions of this chapter shall not be directly or indirectly interested in the sale, manufacture, or distribution of any economic poison."

Water Code, section 70077 (directors of levee districts): "A director shall not be interested, directly or indirectly, in any property purchased for the use of the district, nor in the purchase or sale of any property belonging to the district, nor in any contract made by the district." (See also, e.g., Bus. & Prof. Code, § 7302 [State Board of Cosmetology]; Bus. & Prof. Code, § 12514 [sealers of weighing or measuring instruments]; and Pen. Code, § 2541 [Department of Corrections].)

The second category of statutes regulating conflicts of interest requires an actual disclosure of the conflict. Four of these provisions operate to excuse conflicts of interest if they are disclosed and subsequently ratified by an appropriate body. For example, Government Code section 1091 provides, in part: "[A public] officer shall not be deemed to be interested in a contract entered into by a body or board of which he is a member within the meaning of this article if he has only a remote interest in the contract and if the fact of such interest is disclosed to the body or board of which he is a member and noted in its official records, and thereafter the body or board authorizes, approves, or ratifies the contract in good faith by a vote of its membership sufficient for the purpose without counting the vote or votes of the officer or member with the remote interest." (See also Agr. Code, § 3564 [directors of the California State Fair and Exposition]; Ed. Code, § 1174.5 [governing boards of school districts]; and Ins. Code, § 1101 [officers of insurance companies].)

Five statutes require only that a conflict be disclosed. Government Code section 1120, for example, provides, in part: "Members of governing bodies, boards and commissions of any local public agency shall disclose any direct personal financial interest in any noncontractual matter coming before such governing body, board or commission."

Revenue and Taxation Code section 672, governing applicants to the position of property tax appraiser, provides: "At the time of certification [by the Board of Equalization] each applicant shall disclose, on forms provided by the Board of Equalization, his financial interest in any corporation. Thereafter the form shall be completed annually." (See also Gov. Code, § 67042.1 [members of the Tahoe Regional Planning Agency]; Health & Saf. Code, § 34281 [members of housing authorities]; and Welf. & Inst. Code, § 14022 [persons providing services under Medi-Cal].)

Thus although there are individual differences between the disclosure laws discussed above, there is clearly one common element in all of them. The regulations prohibiting conflicts of interest and requiring the disclosure of financial holdings are limited to only those transactions or holdings which have some relationship, direct or indirect, to the official duties of the public officer or employee. The financial interests disclosure statute at issue in the

present litigation, however, requires the disclosure of *all* investments as defined in the act which exceed $10,000 in value. It may well be that such extensive disclosure rules may appropriately be imposed by the Legislature upon its own members, especially in light of the provision of section 5 of article IV of the Constitution, adopted in 1966, that "The Legislature shall enact laws to prohibit members of the Legislature from engaging in activities or having interests which conflict with the proper discharge of their duties and responsibilities; provided that the people reserve to themselves the power to implement this requirement pursuant to Section 22 of this article [initiative measure]." Such extensive disclosure may also be appropriate for other public officials or employees.

Nothing we say here should be deemed to preclude the Legislature in a properly drawn statute from providing for a broad disclosure of assets, income or receipts relevant to the duties and functions of a public officer or employee.

We are satisfied that in light of the principles applicable to the constitutional rights here involved, no overriding necessity has been established which would justify sustaining a statute having the broad sweep of the one now before us, which, as stated, would intrude alike into the relevant and the irrelevant private financial affairs of the numerous public officials and employees covered by the statute and is not limited to only such holdings as might be affected by the duties or functions of a particular public office. As in *Huntley* v. *Public Utilities Com., supra,* 69 Cal.2d 67, the disclosure requirement reaches beyond any legitimate state interest. Furthermore, the price which the state and the local agencies of government would be expected to pay, should the constitutionality of such a statute be sustained, in the exodus of competent officials from public office and the dispiriting effect on the willingness of other competent citizens to take on the burdens of public office, far outweighs any legitimate public interest to be served.

When, as here, a statute contains unconstitutionally broad restrictions and its language is such that a court cannot reasonably undertake to eliminate its invalid operation by severance or construction, the statute is void in its entirety regardless of whether it could be narrowly applied to the facts of the particular case before the court. The only way in which the statute now at issue could be limited to a proper scope with respect to the officials and employees of plaintiff city would be by reading into it numerous qualifications and exceptions, thereby performing a wholesale rewriting of the statute which the courts cannot reasonably be expected to undertake. (*Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d 499, 508-509, and cases cited; *Fort* v. *Civil Service Com., supra,* 61 Cal.2d 331, 338-340.) We conclude that the statute is unconstitutional in its entirety.

The judgment is reversed. This decision is final forthwith.

Tobriner, Acting C. J., McComb, J., Sullivan, J., and Peek, J.,* concurred.

## APPENDIX

## DIVISION 4.5   CONFLICTS OF INTEREST

### CHAPTER 1.   GENERAL PROVISIONS

**3600.**

The Legislature finds and declares as follows:

(a) The people have a right to expect from their elected and appointed representatives at all levels of government assurances of the utmost in integrity, honesty and fairness in their dealings;

(b) The people further have a right to be assured to the fullest extent possible that the private financial dealings of their governmental representatives, and of candidates for those offices, present no conflict of interest between the public trust and private gain; and

(c) The representative form of government is founded upon a belief that those entrusted with the offices of government have nothing to fear from full public disclosure of their financial and business holdings, provided those officials deal honestly and fairly with the people.

To these ends, the Legislature enacts this division. The Legislature hereby intends to sustain, to the extent necessary, public confidence in government at all levels, by assuring the people of the impartiality and honesty of their officials in all governmental transactions and decisions.

The provisions of this division are to be construed liberally, to the end that the public interest be fully protected.

**3601.**

As used in this division, the term "public agency" means the state, a city, a county, a city and county, or a district, or any subdivision, department, board, commission, body or agency of the foregoing; and includes any public corporation or public authority. The term "public agency" does not include a commission or board the functions of which are purely advisory in nature.

**3602.**

As used in this division, the term "corporation" does not include a charitable corporation which qualifies for exemption from the corporation tax under Section 23701d of the Revenue and Taxation Code.

**3603.**

As used in this division, the term "investments" means real property held for income or gain, and does not include a home or property used primarily for personal or recreational purposes.

**3604.**

As used in this division, the term "ownership of shares" and the term "investments," respectively, include shares and investments owned by either spouse or by a minor child thereof, by a corporation in which the ownership of shares exceeds 25 percent,

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Acting Chairman of the Judicial Council.

or by a trust under which either spouse, or a minor child thereof, is trustor if the trust is revocable, is a beneficiary, or holds a reversionary interest.

**3605.**

As used in this division, "public officer" means a Member of the Legislature, a Secretary of the Governor, the Chief Clerk and the Sergeant at Arms of the Assembly, the Secretary and the Seargeant at Arms of the Senate, an administrative aide or committee consultant of the Legislature, a constitutional officer, and any other officer of a public agency; and includes civil servants in a public agency who are classified as career executives, and the appointive or civil servant employee of the highest class or grade in each department, bureau, division, or other administrative subdivision of a public agency, as defined in regulations adopted by the public agency, but does not include other civil servants in a public agency.

**3606.**

As used in this division, the term "business entity" includes any partnership, joint venture, sole proprietorship or any other corporate or noncorporate enterprise, other than a charitable corporation described in Section 3602.

**3607.**

To the extent that any provision of this division imposes stricter limitations on the disclosure of ownership of shares in a corporation, or the disclosure of political contributions, than provided elsewhere with regard to particular public offices or public agencies, the provisions of this division shall prevail.

To the extent that any other provision of law imposes stricter limitations on the disclosure of ownership of shares in a corporation, or the disclosure of political contributions, with regard to particular public offices or public agencies, than provided in this division, such provision of law shall prevail.

## CHAPTER 2. DISCLOSURE OF FINANCIAL INTERESTS

**3700.**

Prior to the 15th of April of each year, every public officer shall file, as a public record, a statement describing the nature and extent of his investments, including the ownership of shares in any corporation or the ownership of a financial interest in any business entity, which is subject to regulation by any state or local public agency, if such investment is in excess of ten thousand dollars ($10,000) in value at the time of the statement.

**3701.**

Any person who filed a statement under Section 3700 in the preceding year may comply with the requirements of Section 3700 by filing a supplemental statement listing only the changes in the nature, including the extent of his investments and ownership of shares in any corporation or the ownership of a financial interest in any business entity, or stating that no changes occurred if such is the case.

**3702.**

Each candidate as defined in Section 3753 for state or local public office, within 10 days after he files his declaration of candidacy or declaration of acceptance, shall file, as a public record, a statement identical to the statement required by Section 3700.

**3703.**

Candidates and elected officials required to file statements under this chapter shall file in the same place specified in Section 6550 of the Elections Code for the filing of nomination papers. Other state officials and employees required to file statements under this chapter shall file with the Secretary of State. Other local officials and employees required to file statements under this chapter shall file with the county clerk in the county in which they reside.

**3704.**

Any person who violates a provision of this chapter is guilty of a misdemeanor, and any person who violates a provision of this chapter with the knowledge of the unlawfulness of such act or omission is guilty of a felony.

**3753.** [In pertinent part] . . .

(d) The term "candidate" means any person who seeks nomination or election to a state, county, judicial, or district office, or to a municipal office in a general law or chartered city, at any election or primary conducted within this state. "Candidate" also includes persons seeking election to a county central committee at the direct primary election.

---

**MOSK, J.**—I dissent. The majority opinion cannot be supported either procedurally or substantively.

## I

At the threshold we should note the posture of this "litigation." I employ quotation marks because the parties to this proceeding adopted a convivial atmosphere indicating that the lawsuit was contrived, that there is no legitimate controversy, that the rights of no individuals are involved, that the parties are friendly and not adversary, and that they are invoking the jurisdiction of the court merely for an advisory opinion. As recently as *People* ex rel. *Lynch* v. *Superior Court* (1970) 1 Cal.3d 910, 912 [83 Cal.Rptr. 670, 464 P.2d 126], this court pointed out that "The rendering of advisory opinions falls within neither the functions nor the jurisdiction of this court."

No individual officeholder or candidate for public office is being prosecuted or is in imminent peril of prosecution. No individual who has failed or refused to comply with the statute in question is a party to this action. Indeed, the final date for filing financial reports has not yet passed. In short, there is no actual controversy and no ripe issue in this "litigation."

The jurisdiction of United States courts is restricted to "cases" and "controversies." (U.S. Const., art. III, § 2.) The California courts are given jurisdiction over "causes." (Cal. Const., art. VI, §§ 10-12.) As in the federal system, in California the remedy of declaratory relief is wholly statutory (Code Civ. Proc., § 1060), and is limited to "cases of actual controversy relating to the legal rights and duties of the respective parties. . . ." In obedience to this statutory language, it has long been held that declaratory relief will be denied in the absence of a legitimate controversy (*Hayden Plan Co.* v. *Friedlander* (1929) 97 Cal.App. 12, 14 [275 P. 253]), that the plaintiff must demonstrate a personal tangible interest in obtaining a judg-

ment (*Conroy* v. *Civil Service Com.* (1946) 75 Cal.App.2d 450, 455 [171 P.2d 500]), that mere conjecture that at some time in the future a controversy might arise is not sufficient (*Merkley* v. *Merkley* (1939) 12 Cal.2d 543, 547 [86 P.2d 89]), that attempts to get prior approval of conduct is "frowned upon" (*Brown* v. *Board of Police Commrs.* (1943) 58 Cal.App.2d 473, 479 [136 P.2d 617]) and that in general declaratory relief is an inappropriate vehicle to employ in determining validity of criminal sanctions. (*Oppenheimer* v. *Clifton's Brookdale, Inc.* (1950) 98 Cal.App.2d 403 [220 P.2d 422].)

Normally this court would not rule on constitutionality of a legislative enactment until some individual, either convicted or faced with imminent prosecution, seeks relief either on appeal from a conviction or on petition for an extraordinary writ. As stated in *Parker* v. *Los Angeles County* (1949) 338 U.S. 327, 333 [94 L.Ed. 144, 147, 70 S.Ct. 161]: "The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity." This court, too, in *Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65 [195 P.2d 1], expressed the policy of courts of last resort not "to reach out and unnecessarily pronounce upon the constitutionality of any duly enacted statute." Employment of declaratory relief to ascertain the validity of a statute containing criminal sanctions is particularly inappropriate in the absence of a factual context.

The Attorney General and the Legislative Counsel have filed amicus curiae briefs, and both have been helpful to the court. However, amici appearances are not sufficient to negate the essentially nonadversary nature of this "litigation."

The petition for hearing was improvidently granted. On the ground that no actual controversy is presented, I would reverse the judgment and remand to the trial court with directions to dismiss the action.

## II

For more than a century, the Supreme Court has cautioned against rendering judicial decisions on purely political matters. (*Luther* v. *Borden* (1849) 48 U.S. (7 How.) 1 [12 L.Ed. 581].) This case is a textbook illustration of the vice inherent in abandonment of traditional judicial aloofness from contrived litigation. By giving what amounts to an advisory opinion, the majority have catapulted this court into a political thicket. Though in legislative debates some policy misgivings were expressed, the Legislature responded to what it conceived to be public demand and adopted the disclosure law. Expressing similar misgivings, the Governor nevertheless signed

the measure into law.[1] Adherence to the traditional doctrine of separation of powers renders it unseemly for the judiciary to resolve the policy reservations expressed by the legislative and executive branches of government. Statutory desirability must be entirely their responsibility, and use of courts for that determination results in an invasion of legislative and executive prerogatives.

Thus there are two impelling reasons for halting our inquiry short of the merits: lack of a ripe controversy, and the essentially political nature of the problem.

### III

Nevertheless, in order not to be deemed acquiescent in the majority views on the merits, I continue on to discuss the issues as framed by the briefs and the opinion.

That there are conflicting interpretations of a statute is hardly a startling phenomenon in the annals of jurisprudence. If a divergence of views on legislative intent or draftsmanship were the criterion for unconstitutionality, few laws on our books could withstand an assault upon their validity.

Yet the majority find this statute subject to dispute, and, after considering the desirability of the legislation in a discussion bordering on hyperbole, they resolve all doubts in favor of unconstitutionality. The traditional concept in the appellate function is that every intendment favors constitutionality (*Shealor* v. *City of Lodi* (1944) 23 Cal.2d 647, 653 [145 P.2d 574]; *Miller* v. *Municipal Court* (1943) 22 Cal.2d 818, 828 [142 P.2d 297]), and that a reviewing court may not substitute its judgment concerning the wisdom of a statute for that of the Legislature. (*In re Madera Irrigation Dist.* (1891) 92 Cal. 296, 307-308 [28 P. 272, 27 Am.St.Rep. 106, 14 L.R.A. 755], and every constitutional law case for the eight decades thereafter.)

The majority set the melancholy tone of their opinion at the outset: certain municipal officers are so distraught at the prospect of revealing their financial resources that they have threatened to resign. Of what possible relevance to constitutionality is that circumstance? If any public officials deem their personal economic privacy to outweigh their civic responsibility, that is their right.[2] But to argue a "crippling effect upon the affairs of

---

[1] For reaffirmation of the principles of disclosure, see the Governor's State of the State address to Joint Session of the Legislature, January 6, 1970. (Senate Daily J., p. 59; Assembly Daily J., p. 73.)

[2] This right does not always exist. Periodically some individuals—from Henry David Thoreau to Vivian Kellems—refuse to reveal their assets or to pay their taxes, on the ground of invasion of privacy. By their intransigence none has yet successfully prevailed in establishing the unconstitutionality of income tax laws.

municipal government" from prospective resignations which may or may not materialize, as does the plaintiff, is to suggest the indispensability of individual officeholders, a concept that is alien to the democratic process. I am confident that there are many qualified citizens in the picturesque city of Carmel-by-the-Sea who will come forward to serve their municipal government.

The majority cite a plethora of cases involving the basic values "implicit in the concept of ordered liberty" and I heartily endorse the principles of those cases. But with few exceptions the cited authorities involve assaults upon First Amendment rights. If any such rights are in jeopardy by virtue of the provisions of this statute, neither plaintiff nor the majority have alerted us to the identifiable dangers. Precisely which provision of the First Amendment does this statute offend? The majority have given no clue.

After relying primarily upon First Amendment authorities, the majority suddenly change their course and invoke the Fourth Amendment. Yet there is no recognizable relationship between mere disclosure of sizeable pecuniary interests by those who choose to be officeholders or candidates and the constitutional right to security of persons and effects and freedom from unreasonable searches and seizures. To an analysis of this statute the Fourth Amendment is a non sequitur. Rather than belabor the verities of the First and Fourth Amendments, with which no one quarrels, it is much more fruitful to discuss the legislative purpose of the statute, the manner in which the purpose is served, and the validity of that manner.

The legislative purpose is set forth in Government Code section 3600, which reads as follows:

"The Legislature finds and declares as follows:

"(a) The people have a right to expect from their elected and appointed representatives at all levels of government assurances of the utmost in integrity, honesty and fairness in their dealings;

"(b) The people further have a right to be assured to the fullest extent possible that the private financial dealings of their governmental representatives, and of candidates for those offices, present no conflict of interest between the public trust and private gain; and

"(c) The representative form of government is founded upon a belief that those entrusted with the offices of government have nothing to fear from full public disclosure of their financial and business holdings, provided those officials deal honestly and fairly with the people.

"To these ends, the Legislature enacts this division. The Legislature hereby intends to sustain, to the extent necessary, public confidence in gov-

ernment at all levels, by assuring the people of the impartiality and honesty of their officials in all governmental transactions and decisions."

The section concludes with this significant admonition: *"The provisions of this division are to be construed liberally, to the end that the public interest be fully protected."* (Italics added.)

The plaintiff would have us dissect the statute section by section, clause by clause, to discover minute latent defects. In so doing, plaintiff not only departs from the liberal construction commanded by section 3600, but it urges upon us a technique contrary to traditional methods of arriving at statutory construction. (*People* v. *Globe Grain & Mill. Co.* (1930) 211 Cal. 121, 127 [294 P. 3].)

Authorities are legion and unanimous on the subject, but none has more frequently written on methods of statutory construction than Justice Frankfurter, who noted that "Legislative words are not inert, and derive vitality from the obvious purposes at which they are aimed" (*Griffiths* v. *Commissioner of Int. Rev.* (1939) 308 U.S. 355, 358 [84 L.Ed. 319, 322, 60 S.Ct. 277]), and that "Statutes, including penal enactments, are not inert exercises in literary composition. They are instruments of government . . . ." (*United States* v. *Shirey* (1959) 359 U.S. 255, 260 [3 L.Ed.2d 789, 793, 79 S.Ct. 746].) Again and again he taught us that a court is bound "to find that interpretation which can most fairly be said to be embedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that [the legislative body] manifested" (*N.L.R.B.* v. *Lion Oil Co.* (1957) 352 U.S. 282, 297 [1 L.Ed.2d 331, 342, 77 S.Ct. 330]), and a court's duty is to derive meaning "not from specific language but by fashioning a mosaic of significance out of the innuendoes of disjointed bits of a statute." (*Palmer* v. *Massachusetts* (1939) 308 U.S. 79, 83 [84 L.Ed. 93, 97, 60 S.Ct. 34].) Justice Cardozo admonished very simply that "the meaning of a statute is to be looked for, not in any single section, but in all the parts together and in their relation to the end in view." (*Panama Refining Co.* v. *Ryan* (1935) 293 U.S. 388, 439 [79 L.Ed. 446, 468, 55 S.Ct. 241] (dissenting opinion).) Justice Learned Hand defined the task of the judge as to "try as best he can to put into concrete form what [the common] will is, not by slavishly following the words, but by trying honestly to say what was the underlying purpose expressed . . . ." (Hand, The Spirit of Liberty (1952) p. 109.)

The majority assume "that a requirement of relevant disclosures of investments or assets would bear a rational relationship to the valid stated purpose of preventing conflicts of interest," but then they proceed to reach a value judgment "that the purpose can be achieved by regulations drawn more narrowly and precisely than is attempted by the statute now before us." In

short, the majority gratuitously advise the Legislature: Your statute relates to a valid public purpose, but *we* think the purpose should be accomplished in some other manner. This court has no right to substitute its policy determinations for those of another coequal branch of government. "The day is gone," wrote Justice Douglas for a unanimous court in *Williamson* v. *Lee Optical Co.* (1955) 348 U.S. 483, 488 [99 L.Ed. 563, 572, 75 S.Ct. 461]) when a court will strike down state laws of an economic nature "because they may be unwise, improvident, or out of harmony with a particular school of thought." If this act is the product of misdirected zeal, if it should be amended or if another statute can better serve the avowed legislative purpose, the Legislature will respond appropriately. For this court to undertake a process of judicial repeal is clearly an unwarranted usurpation of a strictly legislative prerogative. (*People* v. *Arthur Murray, Inc.* (1965) 238 Cal.App.2d 333, 344 [47 Cal.Rptr. 700].)

As Justice Frankfurter pointed out effectively and at length in his concurring opinion in *American Federation of Labor* v. *American Sash & Door Co.* (1949) 335 U.S. 538, 553-557 [93 L.Ed. 222, 230-233, 69 S.Ct. 258, 6 A.L.R.2d 481]: "Even where the social undesirability of a law may be convincingly urged, invalidation of the law by a court debilitates popular democratic government. Most laws dealing with economic and social problems are matters of trial and error. That which before trial appears to be demonstrably bad may belie prophecy in actual operation. It may not prove good, but it may prove innocuous. But even if a law is found wanting on trial, it is better that its defects should be demonstrated and removed than that the law should be aborted by judicial fiat. Such an assertion of judicial power deflects responsibility from those on whom in a democratic society it ultimately rests—the people. . . . But there is reason for judicial restraint in matters of policy deeper than the value of experiment: it is founded on a recognition of the gulf of difference between sustaining and nullifying legislation. This difference is theoretical in that the function of legislating is for legislatures who have also taken oaths to support the Constitution, while the function of courts, when legislation is challenged, is merely to make sure that the legislature has exercised an allowable judgment, and not to exercise their own judgment, whether a policy is within or without 'the vague contours' of due process. . . .

"Our right to pass on the validity of legislation is now too much part of our constitutional system to be brought into question. But the implications of that right and the conditions for its exercise must constantly be kept in mind and vigorously observed. Because the Court is without power to shape measures for dealing with the problems of society but has merely the power of negation over measures shaped by others, the indispensable judicial requisite is intellectual humility, . . . Matters of policy, however, are by definition matters which demand the resolution of conflicts of value, and the elements

of conflicting values are largely imponderable. Assessment of their competing worth involves differences of feeling; it is also an exercise in prophecy. Obviously the proper forum for mediating a clash of feelings and rendering a prophetic judgment is the body chosen for those purposes by the people. Its functions can be assumed by this Court only in disregard of the historic limits of the Constitution." (Fn. omitted.)

## IV

The right of privacy posited by the majority is reminiscent of fears and criticism of every statute requiring disclosure in an economic field. The pages of history are replete with similar forebodings. The theme reverberated throughout the land when the federal income tax amendment was proposed. When the Corporate Securities Act was adopted in California, it was urged that "the legislature exceeded its powers and thereby infringed upon the constitutional rights of persons to freely enjoy, possess and dispose of property acquired or owned by them." (*People* v. *Craven* (1933) 219 Cal. 522, 525 [27 P.2d 906].) Similar opposition was voiced to the disclosure required of real estate brokers by the commissioner, and, it was said, the statute was arbitrary, indefinite and the terms inadequately defined. (*In re Sidebotham* (1938) 12 Cal.2d 434, 437 [85 P.2d 453, 122 A.L.R. 496].) Zoning ordinances have consistently been attacked for their invasion of private property rights, and just as consistently upheld. (*Clemons* v. *City of Los Angeles* (1950) 36 Cal.2d 95, 98 [222 P.2d 439].) Slum clearance and redevelopment have regularly been opposed for their limitation upon the right to own and use private property. (*Berman* v. *Parker* (1954) 348 U.S. 26 [99 L.Ed. 27, 75 S.Ct. 98].) Police officers, called as witnesses in vice inquiries, have maintained their income tax returns could not be subpoenaed because of their right to privacy. (*Application of Frey* (1948) 26 N.J. Misc. 193 [58 A.2d 594].)

Nevertheless, compulsory disclosure for purposes of licensing and regulation has been held to be constitutional in a wide variety of economic enterprises. (See, e.g., *Nebbia* v. *New York* (1934) 291 U.S. 502 [78 L.Ed. 940, 54 S.Ct. 505, 89 A.L.R. 1469] [unfair trade practices]; *Hall* v. *Geiger-Jones Co.* (1917) 242 U.S. 539 [61 L.Ed. 480, 37 S.Ct. 217] [regulation of securities]; *Brazee* v. *Michigan* (1916) 241 U.S. 340 [60 L.Ed. 1034, 36 S.Ct. 561] [employment agencies]; *Serve Yourself Gas etc. Assn.* v. *Brock* (1952) 39 Cal.2d 813 [249 P. 545] [content of signs]; *Gospel Army* v. *City of Los Angeles* (1945) 27 Cal.2d 232 [163 P.2d 704] [charitable solicitors]; *In re Bear* (1932) 216 Cal. 536 [15 P.2d 489, 83 A.L.R. 1402] [labeling of food products]; *In re Gray* (1929) 206 Cal. 497 [274 P. 974] [sale of drugs]; *In re Holmes* (1921) 187 Cal. 640 [203 P. 398] [secondhand book dealers];

*Howard* v. *State of California* (1948) 85 Cal.App.2d 361 [193 P.2d 11] [painting contractors].) The list is almost limitless.

The United States Supreme Court held in *Shapiro* v. *United States* (1948) 335 U.S. 1, 32-33 [92 L.Ed. 1787, 1807, 68 S.Ct. 1375], that "there are limits which the Government cannot constitutionally exceed in requiring the keeping of records which may be inspected by an administrative agency . . . . But no serious misgiving that those bounds have been overstepped would appear to be evoked when there is a sufficient relation between the activity sought to be regulated and the public concern so that the Government can constitutionally regulate or forbid the basic activity concerned, and can constitutionally require the keeping of particular records, subject to inspection . . . ."

A dispassionate reading of the statute at issue reveals a clear relationship between "the public concern," as expressed in section 3600 and the activity regulated. Indeed the "regulation" is minimal since it involves nothing more than an initial report and a supplement once a year.

The statute is not vague. It requires an annual disclosure of financial interests (§ 3700) by public officers who are enumerated (§ 3605) and by candidates for public office (§ 3702). Financial interests are defined as those in excess of $10,000 in value in any corporation, or in any business entity which is subject to regulation by any state or local public agency. A definition of public agency is set forth (§ 3601) and other terms, such as corporation (§ 3602), investments (§ 3603), and ownership of shares (§ 3604) are defined.

It is not inconceivable that a controversy may develop as to whether an individual is covered as a "career executive" under section 3605. If and when that problem arises, the courts will consider it in a factual context. The speculative nature of a potential difficulty does not justify invalidating an entire statute.

The statute is not overbroad. Even though an act may cause certain hardships to individuals, if it rationally relates to the legislative purpose, it may be upheld.[3] (*Lewis Food Co.* v. *State of California* (1952) (110 Cal.App.2d 759, 762 [243 P.2d 802].) Legislative findings are not binding on courts, but

---

[3] A statute is not unconstitutional because it does not thoroughly cover the subject (*In re Boyd* (1930) 108 Cal.App. 541, 543 [291 P. 845]); or is novel and unusual (*People* v. *La Fetra* (1921) 230 N.Y. 429 [130 N.E. 601, 607, 16 A.L.R. 152]); does not include matters which might have been included (*Arizona Eastern R. Co.* v. *Matthews* (1919) 20 Ariz. 282 [180 P. 159, 163, 7 A.L.R. 1149]); may be impracticable or unworkable (*In re Mossmain Drainage Dist.* (1931) 90 Mont. 1 [300 P. 280, 285]); may operate in an unduly onerous manner (*State* v. *Crescent Cotton Oil Co.* (1918) 116 Miss. 398 [77 So. 185]); may cause hardship (*International Har-*

they are entitled to considerable weight. (*The Housing Authority* v. *Dock-weiler* (1939) 14 Cal.2d 437, 449-450 [94 P.2d 794].) It would seem abundantly clear that there is a direct relationship, in the legislative view, between disclosure of financial holdings of public officers and avoidance of conflicts of interest. We should not find, as a matter of law, that this legislative determination is unsupportable. Indeed, a persuasive case in support of the legislative finding can be made, as pointed out *infra*.

This case involves no restriction upon political activity, such as the court found in *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331 [38 Cal. Rptr. 625, 392 P.2d 385], *Kinnear* v. *City etc. of San Francisco* (1964) 61 Cal.2d 341 [38 Cal.Rptr. 631, 392 P.2d 391], *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499 [55 Cal.Rptr. 401, 421 P.2d 409], and *Vogel* v. *County of Los Angeles* (1967) 68 Cal.2d 18 [64 Cal.Rptr. 409, 434 P.2d 961]. There is no parallel whatever between inhibitions on political activity and this statute, the operation of which merely requires disclosure of sizeable pecuniary interests of certain public officials and candidates for public offices. As this court said in *Bagley* (at p. 505), "government may, when circumstances inexorably so require, impose conditions upon the enjoyment of publicly conferred benefits despite a resulting qualification of constitutional rights." (See *Di Santo* v. *United States* (6th Cir. 1937) 93 F.2d 948, cert. den., 303 U.S. 662 [82 L.Ed. 1121, 58 S.Ct. 829].)

Courts have consistently upheld Corrupt Practices Acts (see annotations collected in 69 A.L.R. 377), which have required reporting of campaign expenditures by candidates for public office. Such legislation has been deemed protective against corrupt election practices and the danger that "those who have . . . aided the successful candidate may expect and demand favors in return during his occupancy of the office." (*Warden* v. *Brown* (1960) 185 Cal.App.2d 626, 628 [8 Cal.Rptr. 518].)

The same rationale applies to this financial disclosure law. Its provisions are designed to provide the public with knowledge of the significant economic factors, if any, which may influence the exercise of a public official's decisional process. For that purpose, it is not unreasonable for the Legislature to require that individuals sacrifice their economic privacy when they assume public office.

In arguing their overbreadth theme, the majority refer to 85 conflict of interest statutes already on our books. Such statistical detail demonstrates only that there are 85 laws which under enumerated circumstances compel

---

vester Credit Corp. v. Goodrich (1954) 308 N.Y. 731 [124 N.E.2d 339]); may cause inconvenience (*Bonner* v. *Jackson* (1923) 158 Ark. 526 [251 S.W. 1, 3]); or does not create a perfect plan to accomplish its purpose (*Williamson* v. *Lee Optical Co.* (1955) *supra*, 348 U.S. 483).

financial disclosure and that not one of these disclosure requirements has been held to violate the First Amendment, the Fourth Amendment, the right of privacy or any other constitutional provision. It is singular that the Legislature, in adopting its 86th enactment in the field, has now offended constitutional principles.

The majority attempt to distinguish between "the relevant and the irrelevant private financial affairs" of public officials (*ante,* p. 272). Justice Holmes once wrote that "Men must turn square corners when they deal with the Government." (*Rock Island etc. R.R.* v. *United States* (1920) 254 U.S. 141, 143 [65 L.Ed. 188, 189, 41 S.Ct. 55].) One may seriously doubt that any investments over $10,000 are irrelevant to a public official and his motivations, or that a major interest in any corporation can be irrelevant in this era of vast conglomerate empires. Public ventilation is generally the most salutary course. Whether this court believes it is or not, the Legislature has found revelation of such financial interests to be relevant to avoidance of conflicts of interest. This legislative finding is clear, unambiguous, reasonable and its statutory application is in no sense overbroad.

Finally, the majority find "no overriding necessity" justifying the statute. To challenge the purpose or necessity of a statute is not a judicial function. There is no rational justification for substituting a finding by this court for the necessity found by the Legislature in section 3600.

**PETERS, J.**—I dissent. For the reasons set forth in part I of the dissenting opinion of Justice Mosk, I am of the view that no actual controversy is presented and that the trial court should be directed to dismiss the proceeding. Since I do not believe that an actual controversy is presented, I find it inappropriate to reach the issue of the validity or invalidity of the statutes involved.