[Civ. No. 16843. Third Dist. Dec. 8, 1977.]

COMMISSION ON CALIFORNIA STATE GOVERNMENT
ORGANIZATION AND ECONOMY, Petitioner, v.
FAIR POLITICAL PRACTICES COMMISSION, Respondent.

**718**

COUNSEL

Evelle J. Younger, Attorney General, Iver E. Skjeie, Assistant Attorney General, and Floyd D. Shimomura, Deputy Attorney General, for Petitioner.

Daniel H. Lowenstein, Robert M. Stern, Michael J. Baker and Lee C. Rosenthal for Respondent.

OPINION

**FRIEDMAN, J.—** ██ In this mandate proceeding the Commission on California State Government Organization and Economy (commission) contends that the Political Reform Act of 1974 exempts it from promulgating a "Conflict of Interest Code" covering its appointive members. It seeks a writ directing the Fair Political Practices Commission (FPPC) to grant its claim of exemption. We hold that the commission is not exempt and deny its petition.

The objective of the Political Reform Act is the promotion of impartial and ethical conduct of public affairs by state and local government officials. (See Gov. Code, § 81000.)[1] The FPPC has primary responsibility for administration of the act. (§ 83111.) One of the act's regulatory segments deals with conflicts of interest. It prohibits a public official, state or local, from participating in or using his official position to

[1] All statutory citations in this opinion will refer to the Government Code.

influence a governmental decision in which he has a financial interest. (§ 87100.)[2] It requires state and local agencies to adopt conflict of interest codes covering their "designated employees." (§ 87300.) Such a code designates the decision-making positions within the agency involving foreseeable conflicts of interest and requires the designated employees to file periodic financial disclosure statements. (§§ 82014, 87302.) The FPPC is the "code reviewing body" for agencies of the state government. (§ 82011.)

Pivotal to the present controversy is section 82019 which excludes from the category of designated employees "any unsalaried member of any board or commission which serves a solely advisory function."[3] Acting under a regulation of the FPPC, the commission submitted a request for exemption grounded upon the claim that its appointive members were all unsalaried and had *solely advisory functions*; that its three staff members and one consultant had no duties engendering potential conflicts of interest; thus, that it had no "designated employees." The FPPC denied the request, approving in substance a staff memorandum whose summary we quote in the margin.[4]

---

[2] Section 87100 declares: "No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest."

[3] To set the phrase in context, we quote section 82019 in full:

" 'Designated employee' means any officer, employee, member or consultant of any agency whose position with the agency

"(a) Is exempt from the state civil service system by virtue of subdivisions (a), (c), (d), (e), (f), (g), or (m) of Section 4 of Article XXIV of the Constitution, unless the position is elective or solely secretarial, clerical or manual;

"(b) Is elective, other than an elective state office; or

"(c) Is designated in a Conflict of Interest Code because the position entails the making or participation in the making of decisions which may foreseeably have a material effect on any financial interest.

" 'Designated employee' does not include an elected state officer or any unsalaried member of any board or commission which serves a solely advisory function."

[4] "This is a unique, extremely powerful commission, comprised of experienced, influential people who are imbued, by statute, with virtually unlimited power to investigate, review and examine every unit within the executive branch of state government. Through statutory authority, they possess the tools, in terms of ability to retain necessary staff, and power to compel access to people, records, files, accounts, statistics and the like, to carry out their duties and make recommendations. They operate with complete independence from outside control and report, if and when they desire, only to the Governor and the Legislature. They regularly follow up their studies and recommendations to urge that there be action and that their recommendations are implemented. This Commission is a 'blue ribbon' commission and is, without doubt, an important decision making body, which ought properly to adopt and be subject to a Conflict of Interest Code. It is the staff's recommendation that this request for an exemption be denied."

To analyze the commission's claim that its members serve a solely advisory function, we briefly survey its character and powers. It consists of nine uncompensated, appointive members plus four legislators serving ex-officio.[5] In general, its mission is to assist the Governor and the Legislature by making studies and recommendations designed to achieve economy, efficiency and improved services within the executive branch of state government. (§§ 8521-8523.) To accomplish this mission, section 8541 equips it with power to hold hearings, to pursue investigations directly or through law enforcement agencies and to conduct studies directly or by contract.[6]

The issue before us—whether the unsalaried commission members have a solely advisory function—does not entail interpretation of an ambiguous statute. Even when words are fairly certain, their application to concrete cases is aided by placing them in context. Even "clear" statutory words gain color and precision from the legislation's objective.

---

[5]As elected state officers the legislator-members of the commission are excluded from the category of "designated employee" (§ 82019) but must comply with other disclosure provisions of the Political Reform Act. The appointive members are uncompensated but are reimbursed for official expenses. (§ 8503.)

[6]Section 8541 declares:

"In carrying out its duties and responsibilities, the commission shall have all of the following powers:

"(a) To meet at such times and places as it may deem proper.

"(b) As a body or, on the authorization of the commission, as a subcommittee composed of one or more members, to hold hearings at such times and places at it may deem proper.

"(c) To issue subpoenas to compel the attendance of witnesses and the production of books, records, papers, accounts, reports, and documents.

"(d) To administer oaths.

"(e) To employ, pursuant to laws and regulations governing state civil service, a secretary and such clerical, legal, and technical assistants as may appear necessary.

"(f) To contract with such other agencies, public or private, as it deems necessary, for the rendition and affording of such services, facilities, studies and reports to the commission as will best assist it to carry out its duties and responsibilities.

"(g) To co-operate with and to secure the co-operation of county, city, city and county, and other law enforcement agencies in investigating any matter within the scope of its duties and responsibilities, and to direct the sheriff of any county or any marshal to serve subpoenas, orders, and other process.

"(h) To certify to the superior court of any county in which proceedings are held, the facts concerning the disobedience or resistance, by any person, of any lawful order, or the refusal of any person to respond to a subpoena, to take the oath or affirmation as a witness, or to be examined, or the misconduct of any person during a hearing; and to receive the assistance of the court in enforcing orders and process, in the manner prescribed by Section 11525 of this code.

"(i) To co-operate with every department, agency, or instrumentality in the state government; and to secure directly from every department, agency, or instrumentality

*Advisory* is authoritatively defined as *having the attribute of advising*; *giving or tending to give advice*; in the context of section 82019 the signification of *advice* is *opinion given or offered as to action.* (the Oxford English Dict.) When these definitions are fleshed out by cognitive notions, the word *advisory* denotes indirect, relatively passive, hortatory and nonbinding counsel or guidance, as contrasted with active management, decision-making and imposition of obligatory orders or decrees. (See Roget's Thesaurus (St. Martin's Press, 1936) Headings 689, 691.)[7]

▇ In section 82019, the exemption statute, the phrase *solely advisory* appears as a description of *function.* The exemption provision is part of a statutory structure aimed at preventing conflicts of interest. The objective is to enhance the purity of decision-making by excluding participants who have a personal financial stake in the decision. The statutory exemption exists because *solely advisory* officials are not decision-makers; they only recommend. The presence or absence of decision-making power is thus an important factor in identifying the wielder of a solely advisory function.

▇ The functions of the commission include its prime mission plus a group of investigatory powers which supply the means for accomplishing that mission. Considered in isolation, the prime mission (formulation of structural and operational recommendations submitted for acceptance or rejection by the Governor and Legislature) is undebatably advisory.

Directly and by indirection, the exercise of its aggregate power transforms the commission into an active manager and originator of decisions. The commission's decision-making, nonadvisory function emerges when its discrete activities are viewed collectively. The govern-

---

full co-operation, access to its records, and access to any information, suggestions, estimates, data, and statistics it may have available.

"(j) To authorize its agents and employees to absent themselves from the State where necessary for the performance of their duties.

"(k) To do any and all other things necessary or convenient to enable it fully and adequately to perform its duties and to exercise the powers expressly granted it."

[7]These orthological observations are consistent with judicial decisions characterizing governmental advisory bodies. In general, these decisions view *advisory* as a description of informational, recommendatory, nonimperative activity. (See *McGraw* v. *Marion County Plan Commission* (1961) 131 Ind.App. 686 [174 N.E.2d 757, 760];. *Regents of University of Michigan* v. *State* (1975) 395 Mich. 52 [235 N.W.2d 1, 10]; *Harrington* v. *Tate* (1969) 435 Pa. 176 [254 A.2d 622, 624]; *Hueske Implement Company* v. *Shipley* (Wyo. 1968) 445 P.2d 9, 12; see also, Federal Advisory Commission Act, 5 U.S.C., Appen. I; *Nader* v. *Baroody* (D.D.C. 1975) 396 F.Supp. 1231, 1233.)

ing statutes do not limit its choice of investigative areas. Within the broad gamut of executive agencies, the commission chooses its own investigative priorities. Its selection of a particular segment of government is coupled with the power to hold hearings, to force the production of evidence by subpoena and oath and to enlist the aid of law enforcement agencies. The investigation then culminates in a public report, which may be mildly or sharply critical of the agency and its staff. These collective commission functions are directly influential upon the decision-making activities of the operating agencies.

According to the statutory letter, the commission operates indirectly, submitting its studies and recommendations to the Governor and Legislature, which may accept or reject them. The indirection is only nominal and theoretical. Executive agencies which are vulnerable to charges of abuse, inefficiency or waste, will tend to anticipate public criticism by voluntary self-improvement. The more vulnerable the agency, the greater its sensitivity to the commission's investigatory power. Like a biological organism, the complex and interdependent array of executive agencies responds to external stimuli and to internally secreted adrenalin. In real life the commission's investigations are not all indirect and advisory. They are capable of directly altering the activities, that is, the decisions of executive agencies, resulting in tangible effects which far outdistance the soft inducements of good counsel.[8]

---

[8]Included in the record are a number of public documents which are available for judicial notice as public acts. (Evid. Code, § 452, subd. (c).) These illustrate the directness of the commission's influence upon the state's operating agencies and the relationship of the commission's investigations to private business interests. For example, one study caused changes in procedures for the purchase and maintenance of state passenger automobiles and California Highway Patrol vehicles. A commission report resulted in expansion of the staff of the Contractor's State License Board which had accumulated a backlog of 13,000 complaints against licensed contractors. Another of the commission's inquiries caused marked acceleration of the sale of surplus real estate in the hands of the state transportation agency. These changes in state practices occurred without recourse to legislation. A press release dated February 11, 1974, describes the transportation agency's direct response to the commission's study:

"SACRAMENTO:—The State Department of Transportation has divested itself since 1971 of over 9,000 parcels of land valued at almost $40 million, in response to a recommendation by the Commission on California State Government Organization and Ecomony (Little Hoover Commission), that the Division of Highways accelerate the return of the land to private use.

"When the Commission completed its 1971 study of unused land not needed for highway use, it found no inventory, a lack of system and little real interest related to the disposal issue. It called for the department to divest the state of all property held in excess.

"At the time of inquiry, the Division of Highways' sale of surplus property amounted

These observations gain added force when juxtaposed to the conflict of interest provisions of the Political Reform Act. Foremost of these is section 87100 (fn. 2, *ante*). (■■ An official has a financial interest in a decision when it is "reasonably foreseeable" that the decision will have a material financial effect on his investments, property or income. (§ 87103.) The conflict of interest laws operate without regard to actual corruption or actual governmental loss; they establish an objective standard "directed not only at dishonor, but also at conduct that tempts dishonor;" they are preventive, acting upon tendencies as well as prohibited results. (*U.S.* v. *Mississippi Valley Co.* (1961) 364 U.S. 520, 549-551 [5 L.Ed.2d 268, 288-290, 81 S.Ct. 294]; *Stigall* v. *City of Taft* (1962) 58 Cal.2d 565, 569 [25 Cal.Rptr. 441, 375 P.2d 289]; *People* v. *Watson* (1971) 15 Cal.App.3d 28, 37-39 [92 Cal.Rptr. 860].) A violation occurs not only when the official participates in the decision, but when he influences it, directly or indirectly. (§ 87100, fn. 2, *ante*; *Stigall* v. *City of Taft, supra,* 58 Cal.2d at p. 569.) Thus, a public official outside the immediate hierarchy of the decision-making agency may violate the conflict of interest law if he uses his official authority to influence the agency's decision.

(■■ The appointive members of the Commission on California State Government Organization and Economy are uncompensated, parttime public officials. Their tasks implicitly but firmly call for people of talent, rich in the insights supplied by business and professional success. One or several members may pursue state-licensed occupations; others may be drawn from state-supervised insurance or banking firms; one may be a property developer interested in surplus lands to be sold by the state, another an official of a corporation engaged in controversy with a state taxing agency. Through participation in or influence upon the commission's investigatory actions, the commission member is vested with power to influence the decisions of state agencies which regulate or affect his private business, property or income. There is a "rational connection" and a "potential conflict" between the private business affairs of the commission members and the sweeping range of the commission's investigative activities. (See *City of Carmel-By-The-Sea* v. *Young* (1970) 2 Cal.3d 259, 269-270 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313].) The preventive purpose of the conflict of interest laws is blunted by the

to only $2 million a year. This month, the Commission reported excess land inventory, originally 10,565 parcels, and [*sic*] had been reduced to 5,420 parcels with a corresponding book value of $30 million. . . ."

members' exemption from the disclosure requirements governing "designated employees."

The commission's power to contract with other agencies involves it in "contracting out," a function not at all advisory. Private consulting firms, nonprofit organizations and educational institutions offer themselves as contracting suppliers of governmental expertise. (See *California State Employees' Assn.* v. *Williams* (1970) 7 Cal.App.3d 390, 398-399 [86 Cal.Rptr. 305].) Award of a study or consulting contract is preceded by decisions to investigate by contract rather than directly and to select one contractor rather than another. Neither the preliminary decisions nor the award are advisory; they are managerial.

The commission points out that refusal to recognize its members' "solely advisory" character will discourage membership on this and a number of other state advisory boards. True, the exemption is designed to induce citizens to accept uncompensated, parttime public service without vulnerability to periodic financial disclosures. Financial disclosure laws exact a cost in terms of impaired privacy. (*City of Carmel-By-The-Sea* v. *Young, supra,* 2 Cal.3d at pp. 268-269.) Many citizens would rather hang onto their privacy than damage it through public service. The damage to privacy is inflated by enterprising journalists who mistake gossip for news. The cost, at any rate, is a concern of the legislative branch, not the courts. The statutory exemption is limited to boards and commissions which are solely, that is, exclusively advisory. The Commission on California State Government Organization and Economy does not fit the statutory description. Whether other state boards and commissions do so may be an issue in other lawsuits.

Petition denied.

Puglia, P. J., and Evans, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied February 1, 1978.